- 1 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

ANDIN INTERNATIONAL, INC.,

        Plaintiff,

    -against-

YURMAN STUDIO, INC.,

        Defendant.

------------------------------------- x

YURMAN STUDIO, INC.,

        Defendant-
        Counterclaimant,

    -against-

ANDIN INTERNATIONAL, INC. and
VARDI GEM LUSTRE, LLC

        Counterclaim-
        Crossclaim Defendants.

------------------------------------- x

Civil Action No. 08 cv 1159 (HB)

---

### DECLARATION OF RAMONA AZULAY SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Ramona Azulay declares as follows:

    **1.**    I am a consultant at Andin International, Inc. ("Andin").

    **2.**    From April 2006 through April 4, 2008 I was the Director of Merchandising at Andin.

3. Prior to working for Andin I was a consultant for about one and a half years. Prior to that, I was the director of merchandising and electronic retailing for Aurafin Jewelry. I was at Aurafin Jewelry for nine (9) years. Before Aurafin, I was employed as the vice president of marketing for Jan Bell Marketing (now Mayor's Jewelers), the director of marketing and product development for Sage Marketing (a fashion jewelry company) and a buyer of jewelry for Filene's Basement.

4. I was the Director of Merchandising at the time that the accused Andin pieces were designed, manufactured and first sold.

5. In 2007, Ofer Azrielant gave me a ring that he had received from Moshe Vardi (the "Vardi Ring"). Mr. Azrielant asked me to use this ring for inspiration and to re-design it, for possible inclusion in Andin's silver ring collection.

6. I have been in the jewelry industry for 22 years. During this time I have seen thousands of jewelry styles and pieces. I have seen many products that feature a pave center, as well as many pieces that include gold accents (such as a gold frame) and many pieces that incorporate the pave center with gold accents and silver textures.

7. Using the Vardi Ring for inspiration, I worked with Andin's outside designers (a company called Channel Ace) to create a variation for a new ring. We changed the orientation of the ring so that when it is worn, the longer axis of the rectangular band which surrounds the pave dome lies along an east-west axis across the wearer's finger. A polished silver frame or step around the pave field was eliminated. The overall size of the ring, including the rope, was diminished.

8. I oversaw the design of this new ring (the "Andin Ring").

9. The Vardi Ring was the only jewelry that served as inspiration for the Andin Ring, and the Andin Ring was indeed inspired by the Vardi Ring. I need to note

that the word "inspire" does not mean "copy." When I design a ring, I may be inspired by a variety of different things, from an ice cream cone to a sneaker to a fashion trend to another piece of jewelry. Essentially, "inspiration" means that the idea behind the original is used to create a new work.

10. Prior to this dispute, I had never seen the Yurman Enhancer.

11. The first time that I saw the Yurman Enhancer was on January 29, 2008, when I purchased it from Yurman's store on Madison Avenue in New York.

12. When the dispute arose, I visited several retailers that carry Yurman products, including Yurman's store here in New York City, looking for the Yurman Enhancer. I could not find the Yurman Enhancer – or even any products that looked like the Yurman Enhancer – in any of the stores I visited. Finally, I was able to buy the Yurman Enhancer at Yurman's flagship store on Madison Avenue in New York City.

13. At the time that I purchased the Yurman Enhancer at Yurman's flagship store, the Yurman Enhancer was not on display. I described the Yurman Enhancer to two different sales people. Each came with different trays for me to look at. In total, I was shown approximately 20 different enhancers which were <u>not</u> the same as the Yurman Enhancer, before I was presented with the Yurman Enhancer. In total, it took approximately 30 minutes for these sales people to finally provide me with the Yurman Enhancer.

14. When the dispute arose, I also attempted to locate the Yurman Ring. Again, I was unable to find the Yurman Ring in any retail stores, including Yurman's own retail stores. I was finally able to purchase the Yurman Ring at the Bloomingdale's store in Boca Raton, Florida. I could not find the Yurman Ring at any stores in the New York City area.

15. Since purchasing it, I have personally examined the Yurman Enhancer. The elements of the Yurman Enhancer that I observed are: (1) a diamond pave rectangular center in a north-south alignment; (2) a stepped, double gold frame surrounding the pave field; (3) a thick single sculpted cable design below and surrounding the gold frame, sculpted in a clockwise direction; (4) a polished silver outer frame; (5) a gold crown at the top of the pendant; (6) a gold crown at the bottom of the bale; and (7) silver piping surrounding a silver sculpted cable hinged enhancer bale.

16. All of these elements in the Yurman Enhancer are attached to a bale by a crown. The bale is comprised of a single cable located between two lines of piping. The bale features a snap closure that allows the wearer to attach the enhancer to a variety of other jewelry items.

17. From my experience in the jewelry industry, I am aware that the use of a pave central field is well known. Copies of items using the pave field are included as exhibits to Ofer Azrielant's declaration submitted herewith.

18. From my experience in the jewelry industry, I am aware that there are numerous uses of rounded stones to create a "cushion" as the central focal point of a piece of jewelry. Copies of items using rounded stones to create a cushion are included as exhibits to Ofer Azrielant's declaration submitted herewith.

19. From my experience in the jewelry industry, I am aware that gold "framing" of a central stone, including pave diamonds, is something which has existed long before Yurman. Copies of items using gold framing are included as exhibits to Ofer Azrielant's declaration submitted herewith.

20. From my experience in the jewelry industry, I am aware that cable jewelry has been used for centuries. Copies of items using cable are included as exhibits to Ofer Azrielant's declaration submitted herewith.

21. From my experience in the jewelry industry, I am aware that there are several products on the market today that have some or all of the features that are also present in the Yurman Enhancer. Copies of such items are included as exhibits to Ofer Azrielant's declaration submitted herewith.

22. Upon examining the Yurman Enhancer and comparing it to the Andin Ring, I observed several differences, and the two pieces have a very different overall look and feel.

23. The orientation of the Andin Ring is different from the orientation of the Yurman Enhancer. The Andin ring has an "east-west" orientation whereas the Yurman Enhancer has a "north-south" orientation. The Andin Ring has a rectangular pave field with rounded corners, surrounded by an inner frame, which in turn is surrounded by a multiple cable. The cable on the Andin Ring is triple stacked, and appears as twisted piping rather than as a sculpted design. The cable on the Yurman Enhancer runs clockwise, while the cable on the Andin Ring runs counter-clockwise. The Andin Ring features a three-cable tier descending from the inner frame, and has no outer polished frame. Finally, the Andin Ring has no bale and has no crown connecting its body to a bale.

24. Upon examining the Yurman Enhancer and comparing it to the Andin Earrings, I observed several differences. As with the Andin Ring, the Andin Earring has a very different overall look and feel than the Yurman Enhancer.

25. The pave field on the Andin Earring is different from the pave field on the Yurman Enhancer, as is the proportion of pave to the entire piece. In the Yurman Enhancer, the gold frame abuts the pave field, whereas in the Andin Earring it does not – there is a noticeable space between the gold frame and the structural frame around the pave field. The cable on the Andin Earring looks like twisted piping, whereas the cable on the Yurman Enhancer appears to be sculpted, and has a much thicker look and feel. The Andin Earring does not have the high polished silver outer edge, nor does it have the structural pieces of the bale detailed above (i.e. the crown, piping, etc.).

26. Upon examining the Yurman Enhancer and comparing it to the Andin Pendant, I observed several differences. As with the Andin Ring and Andin Earrings, the Andin Pendant has a very different overall look and feel than the Yurman Enhancer.

27. The pave field on the Andin Pendant is different from the pave field on the Yurman Enhancer, as is the proportion of pave to the entire piece. In the Yurman Enhancer, the gold frame abuts the pave field, whereas in the Andin Pendant it does not – there is a noticeable space between the gold frame and the structural frame around the pave field. The cable on the Andin Pendant is triple stacked and looks like twisted piping and has a totally different look and feel than the sculpted cable contained in the Yurman Enhancer. The Andin Pendant does not have the high polished silver outer edge. Finally, the bale for the two pieces is entirely different.

28. An enhancer (i.e. the item sold by Yurman) has a hinged enhancer bale-like component that may be opened to fit over a variety of pieces, such as a strand of pearls or beads, and then locked closed. An enhancer is meant to slide onto the chain rather than to be soldered to it so that it is not permanently part of the chain. The Andin

pendant, on the other hand, is an ornament designed to be suspended from a chain or necklace and cannot be clipped.

29. From my experience in the jewelry industry, I have observed that, just as people are typically reluctant to exert physical effort, but will do so if they are sufficiently motivated, when purchasing a product, people will exert cognitive effort if they are sufficiently motivated. This motivation is influenced by several factors including: the level of a consumer's involvement with a product – meaning how "into" the product a consumer is for a hobby or enduring interest. Luxury brand jewelry requires a high level of involvement, but even non-luxury brand jewelry involves serious consideration prior to a purchase because of the cost and personalized tastes.

30. Basically, there are two antecedents to the exercise of care consumers display when purchasing jewelry: (1) a sufficient level of motivation for care and, (2) an adequate ability to be careful. Here, the cost of jewelry – and certainly the cost of Yurman's jewelry – provides motivation for consumers to be careful. Individuals that purchase Yurman's jewelry at issue here, which costs more than $1,500 (and I paid over $3,000 for the Yurman ring) clearly are motivated to review the jewelry they are purchasing.

31. Andin targets middle market consumers. Thus, Andin's target consumers have household incomes of $40,000 - $90,000. If any of these consumers were purchasing from Yurman as well, it would mean that the individual would be spending anywhere form 1.5% to 9% of their yearly income on these Yurman products. Obviously, the consumers would be very motivated to take care when shopping. Even a consumer purchasing the Andin jewelry at issue, which retails for between $150 and $300, a consumer would be spending a significant portion of her income.

32. Individuals that are brand conscious, like those purchasing jewelry from Yurman, also are sufficiently motivated to exercise care when purchasing jewelry. These individuals are buying because of the brand. As detailed below, Yurman's advertisements sell a "lifestyle" or "aspiration" for luxury. As such, Yurman's consumers are seeking a branded product which costs significantly more than similar non-branded jewelry. Accordingly, Yurman's consumers also are motivated to exercise care.

33. Jewelry offers a unique opportunity for consumers to exercise care as well. Simply put, jewelry is kept in a case. A consumer first reviews items inside the case. When jewelry is branded, the designer's name typically appears in the case. Thus for instance, when I searched for Yurman's jewelry in connection with this action, each retail establishment that I went to had a case which had the name "David Yurman" next to Yurman's jewelry.

34. After a consumer sees a piece that she is interested in, she must ask a store employee for help. The store employee removes the piece from the case, and the consumer can look at the piece more carefully and/or try on the piece. The consumer can inspect the piece of jewelry, find out manufacturing information, etc.

35. Even if this process is quick, it takes several minutes. However, if the consumer is to compare jewelry, it can take significantly longer.

36. From my experience in the jewelry industry, I believe that the jewelry items at issue in this case are not "impulse" items for either Yurman's consumers or Andin's consumers. Simply put, these consumers spend a great deal of time and care in picking out the items, the items are relatively expensive, and the items are reviewed for the purpose of a consumer's taste.

37. From my experience and observations in the jewelry industry, I know that consumers enjoy analyzing, processing and researching a product or brand before purchasing it. This is especially so for luxury brands like Yurman. Likewise, a consumer is given plenty of ability to exert his or her cognitive effort during the selection of jewelry. In purchasing jewelry, the environment is not one with distractions and a consumer is presented with the ability to compare information and take time.

38. I indicated above that Yurman's advertisements sell a "lifestyle" or an "aspiration." In general terms, this means that the advertiser focuses on an idealized fantasy rather than the lifestyle that most people maintain. The premise on which aspirational advertising is based is that if the consumer purchases a certain offering, his or her life will change.

39. The Yurman advertising with which I am familiar is all "aspirational" or "lifestyle" advertising. The advertisements that come to mind feature very thin models, with wind blowing their hair. The models are dressed in expensive clothing and are shown in exotic settings, such as on a beach, in a luxurious room, etc. The jewelry itself if not the feature of the advertisement. Because Yurman promotes a "lifestyle" more than the jewelry itself, there is also a social aspect to buying Yurman's jewelry. Neither Andin nor its customers utilize such advertising techniques.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Ramona Azulay