UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANDIN INTERNATIONAL, INC.,

        Plaintiff,

      -against-

YURMAN STUDIO, INC.,

        Defendant.

Civil Action No. 08 cv 1159 (HB)

- - - - - - - - - - - - - - - - - - - - - - - - - x

YURMAN STUDIO, INC.,

        Defendant-
        Counterclaimant,

      -against-

ANDIN INTERNATIONAL, INC. and
VARDI GEM LUSTRE, LLC

        Counterclaim-
        Crossclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW SUBMITTED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

I. Introduction ............................................................................................................ 1

II. Point One - Andin Is Entitled To Summary Judgment On The Issue Of Copyright
Infringement As Yurman Cannot Prove Access ........................................................ 2

    A. Standard of Review ....................................................................................... 3

    B. Law with Regard to Access............................................................................ 4

    C. Yurman Cannot Prove Copying Because There Was No Access ..................... 5

III Point Two - Andin is Entitled to Summary Judgment on the issue of Copyright
Infringement as the Accused Products were Independently Created ........................... 7

IV. Point Three - Andin is Entitled to Summary Judgment on the issue
of Copyright Infringement as the Accused Products are not Substantially Similar to the
Yurman Enhancer ..................................................................................................... 8

    A. The Elements of the Yurman Enhancer are all in the Public Domain .............. 8

    B. Standard of Review: The More Discerning Ordinary Observer Test................ 9

    C. The Andin Ring Does Not Infringe Yurman's Copyright................................10

    D. The Andin Earring Does Not Infringe Yurman's Copyright ...........................11

    E. The Andin Pendant Does Not Infringe Yurman's Copyright............................12

V. Point Four Andin is Entitled to Summary Judgment on the issue of
Trade Dress Infringement as Yurman cannot Demonstrate That its Trade Dress has Acquired
Secondary Meaning...................................................................................................13

    A. Governing Law ............................................................................................14

    B. Yurman Cannot Demonstrate Evidence of Secondary Meaning ......................14

        (i) Insufficient Advertising...................................................................14

        (ii) There are No Consumer Studies.....................................................15

        (iii) There has been No Unsolicited Media Coverage of Yurman's Trade Dress ............15

(iv) There has been no Sales Success for the Yurman Trade Dress....................................15

(v) Yurman has Produced No Evidence that Anyone has
     Plagiarized the alleged trade dress ...........................................................16

(vi) Yurman has No Period of Exclusivity of Use ...........................................16

(vii) Conclusion on Secondary Meaning........................................................17

VI. Point Five Andin is Entitled to Summary Judgment on the
    issue of Trade Dress Infringement as Yurman Cannot Articulate
    A Distinct Trade Dress...............................................................................17

VII Point Six - Andin is Entitled to Summary Judgment on the
    issue of Trade Dress Infringement as Yurman Cannot Demonstrate
    A Likelihood of Confusion .........................................................................19

    A. Application of the Polaroid Factors ........................................................19

    (i) Yurman's Trade Dress is Not Strong .....................................................19

    (ii) The Trade Dresses at Issue Are Not Similar ..........................................20

    (iii) Proximity and Bridging the Gap .........................................................20

    (iv) There has been no Actual Confusion....................................................22

    (v). No Bad Intent By Andin ......................................................................22

    (vi) Quality of Andin's Products ................................................................23

    (vii).Sophistication of Consumers ..............................................................23

    B. Conclusion on the Issue of Likelihood of Confusion................................23

VIII. Point Seven - Andin is Entitled to Summary Judgment on the
     issue of Trade Dress Infringement as Yurman Cannot Demonstrate Actual Damages...............24

IX. Conclusion ...........................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Amnesty Am. v. Town of W. Hartford,*
   361 F.3d 113 (2d Cir. 2004) ................................................................ 4

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986)) ................................................................... 3, 4

*Arrow Fastener Co. v. Stanley Works,*
   59 F.3d 384 (2d Cir. 1995) ........................................................ 22, 24

*Aslanidis v. U.S. Lines, Inc.,*
   7 F.3d 1067 (2d Cir. 1993)) ................................................................ 3

*BellSouth Telecomms., Inc. v. W.R. Grace & Co.,*
   77 F.3d 603 (2d Cir. 1996) ................................................................. 4

*Boisson v. Banian, Ltd.,*
   273 F.3d 262 (2d Cir. 2001) ......................................................... 4, 10

*Bouboulis v. Transport Workers Union of Am.,*
   442 F.3d 55 (2d Cir. 2006) ................................................................ 3

*Cadbury Beverages, Inc. v. Cott Corp.,*
   73 F.3d 474 (2d Cir. 1996) ................................................. 19, 20, 23

*Caldarola v. Calabrese,*
   298 F.3d 156 (2d Cir. 2002) .............................................................. 3

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,*
   150 F.3d 132 (2d Cir. 1998) .............................................................. 4

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S. Ct. 2548, 91 L.
   Ed. 2d 265 (1986) ........................................................................... 3

*Computer Associates International Inc. v. Altai Inc.,*
   982 F.2d 693 (2d Cir. 1992) .............................................................. 9

*Conway v. Microsoft Corp.,*
   414 F. Supp. 2d 450 (S.D.N.Y. 2006) ............................................... 3

*Dawson v. County of Westchester,*
   373 F.3d 265 (2d Cir. 2004) .............................................................. 4

*Distasio v. Perkin Elmer Corp.,*
   157 F.3d 55 (2d Cir. 1998) ................................................................ 3

*Fastener v. Stanley Works,*
   59 F.3d 384 (2d Cir. 1995) ........................................................ 22, 24

*Favia v. Lyons Partnership,*
   1996 U.S. Dist. LEXIS 5306
   (S.D.N.Y. 1996) ............................................................................... 6

iii

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991)........................................................................... 4

*Fisher-Price, Inc. v. Well-Made Toy Manufacturing Co.,*
   25 F.3d 119 (2nd Cir. 1994) ........................................................... 9

*Folio Impressions, Inc. v. Byer California,*
   937 F.2d 759 (2d Cir. 1991) ......................................................... 10

*Gidatex v. Campaniello Imports Ltd.,*
   82 F. Supp. 2d 136 (S.D.N.Y. 2000) ........................................... 24

*Globecon Group, LLC v. Hartford Fire Ins. Co.,*
   434 F.3d 165 (2d Cir. 2006) ........................................................... 3

*Huminski v. Corsones,*
   396 F.3d 53 (2d Cir. 2004) ............................................................. 3

*ITC Ltd. v. Punchgini, Inc.,*
   482 F.3d 135 (2d Cir. 2007) ......................................................... 14

*Johnson & Johnson v. Actavis Group hf,*
   2008 U.S. Dist. LEXIS 17680
   (S.D.N.Y. 2008) ............................................................................ 14

*Jorgensen v. Epic/Sony Records,*
   351 F.3d 46 (2d Cir. 2003) ............................................................. 4

*Knitwaves, Inc. v. Lollytogs Ltd.,*
   71 F.3d 996 (2d Cir. N.Y. 1995)..................................................... 9

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
   113 F.3d 373 (2d Cir. 1997) ......................................................... 17

*Lang v. Ret. Living Pub. Co.,*
   949 F.2d 576 (2d Cir. 1991) ......................................................... 20

*Laureyssens v. Idea Group, Inc.,*
   964 F.2d 131 (2d Cir. 1992) ........................................................... 4

*Maharam v. Patterson,*
   84 U.S.P.Q.2d 1056 (S.D.N.Y. 2007)............................................ 7

*Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,*
   65 F.3d 1063 (2d Cir. 1995) ......................................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574, 106 S. Ct. 1348, 89 L.
   Ed. 2d 538 (1986)) ......................................................................... 3

*McClellan v. Smith,*
   439 F.3d 137 (2d Cir. 2006) ........................................................... 3

*Mitchell v. Shane,*
   350 F.3d 39 (2d Cir. 2003) ............................................................. 3

*Natural Organics, Inc. v. Nutraceutical Corp.,*
  426 F.3d 576 (2d Cir. 2005) ............................................................................... 19

*Nichols v. Universal Pictures Corp.,*
  45 F.2d 119 (2d Cir. 1930) ................................................................................. 10

*Nora Beverages, Inc. v. Perrier Group of America, Inc.,*
  269 F.3d 114 (2d Cir. 2001) ............................................................................... 19

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,*
  317 F.3d 209 (2d Cir. 2003) ............................................................................... 19

*Playtex Prods., Inc. v. Georgia-Pacific Corp.,*
  390 F.3d 158 (2d Cir. 2004) ......................................................................... 19, 20

*Polaroid Corp. v. Polarad Elecs. Corp.,*
  287 F.2d 492 (2d Cir. 1961) ......................................................................... 19, 22

*Powell v. Nat'l Bd. of Med. Exam'rs,*
  364 F.3d 79 (2d Cir. 2004) ................................................................................... 3

*Qualitex Co. v. Jacobson Products Co.,*
  514 U.S. 159 (1995) ............................................................................................ 13

*R.G. Group, Inc. v. Horn & Hardart Co.,*
  751 F.2d 69 (2d Cir. 1984) ................................................................................... 4

*Ripka Designs, Ltd. v. Penny Preville, Inc.,*
  935 F.Supp. 237 (S.D.N.Y. 1986) ...................................................................... 10

*Stewart v. Abend,*
  495 U.S. 207 (1990) .............................................................................................. 9

*Streetwise Maps v. VanDam, Inc.,*
  159 F.3d 739 (2d Cir. 1998) ............................................................................... 22

*Stuart v. American Cyanamid Co.,*
  158 F.3d 622 (2d Cir. 1998)) ................................................................................ 3

*Time, Inc. v. Petersen Pub. Co. LLC,*
  173 F.3d 113 (2d Cir. 1999) ............................................................................... 20

*Tomasini v. The Walt Disney Co.,*
  84 F.Supp.2d 516, (S.D.N.Y. 2000) ..................................................................... 6

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.,*
  532 U.S. 23 (2001) .............................................................................................. 24

*U.S. v. Diebold, Inc.,*
  369 U.S. 654 (1962) .............................................................................................. 4

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.,*
  373 F.3d 241 (2d Cir. 2004) ................................................................................. 3

*Virgin Enters. v. Nawab,*
  335 F.3d 141 (2d Cir. 2003) ......................................................................... 13, 20

*Wal-Mart Stores, Inc. v. Samara Bros.,*
    529 U.S. 205 (2000)............................................................................ 13

*Williams v. Utica Coll. of Syracuse Univ.,*
    453 F.3d 112 (2d Cir. 2006) ............................................................... 3

*Yurman Design, Inc. v. PAJ, Inc.,*
    262 F.3d 101 (2d Cir. 2001) ............................................................. 13

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................ 3

**Other Authorities**

Patry on Copyright § 9:74 ................................................................... 11

Plaintiff Andin International, Inc. ("Andin") respectfully submits this memorandum of law as well as the declarations of Ofer Azrielant, Ramona Azulay, Marilyn Williams, Scott Lyle and Allison Caire Aucoin in support of summary judgment.

## I. <u>INTRODUCTION</u>

This action has all the earmarks of a proverbial "David vs. Goliath" case, in which Yurman continues to prosecute this action solely to harass Andin.[1] Yurman acknowledges, as it must, that its trade dress and copyright consist of elements that predate Yurman – in some cases by millennia – and combinations that are in use by third parties. Nonetheless, wielding both trade dress and copyright claims, Yurman seeks to use the law to achieve an unwarranted anticompetitive result.

After Yurman accused Andin and its customers of copyright infringement, Andin brought this action seeking declaratory judgment that three jewelry items designed, manufactured and sold by Andin do not infringe Yurman's alleged copyright. Not only were Andin's design independently created, but Andin did not even have access to Yurman's copyright. Moreover, Andin's three jewelry items are not substantially similar to Yurman's copyrighted jewelry item – whether using an ordinary observer standard or a heightened standard as applicable here. Indeed, David Yurman, chairman of Yurman, admitted to Ofer Azrielant, chairman of Andin, that he does not have an issue with one of the three Andin jewelry items in dispute.

The Court and a leading commentator both expressed serious doubt about Yurman's copyright claim, which resulted in Yurman engaging in procedural wrangling and transforming its case into one for trade dress infringement. That Yurman's trade dress is nothing more than an afterthought manufactured for this action is beyond cavil – the only two witnesses to testify

---

[1]    After Judge Cedarbaum expressed doubt about Yurman's claim, Yurman moved to recuse Judge Cedarbaum and disqualify Andin's counsel. Yurman then changed the nature of its claim. Yurman's trade dress claim – which was not raised in response to a national advertisement – was first raised at this time, suggesting that, at best there was low awareness of the trade dress within the Yurman organization, and, at worst, that it was manufactured to traverse a dubious copyright claim.

about this trade dress had differing views of its elements. More important, Yurman's product configuration trade dress lacks secondary meaning, rendering it unenforceable. Indeed, when pressed, Mr. Yurman himself could only cite to hyperbole (e.g. that the people who did not recognize his trade dress must have been unable to join a particular sorority, live in rabbit holes, etc.) as "proof" of secondary meaning.[2] Indeed, Yurman does not currently advertise its trade dress pieces on its web-site, in its catalogues, in national advertising, or even have some of them available for purchase in his flagship store on Madison Avenue! In fact, there has been no proffer of any advertising over the last three years. Thus, it is clear that Yurman has not produced any admissible evidence that its alleged trade dress has any source-identifying power.

Tolling the death knell for Yurman's claim is that there is no proof of a likelihood of confusion. Notwithstanding that Yurman consented to the sale of the accused jewelry through two of the nation's biggest retailers – Sam's Club and JC Penney – and despite the fact that Andin has been selling the accused products for almost one year, there is no direct evidence that consumers in the real world have ever been confused as to the source or sponsorship of Andin's products. A jury trial is neither necessary nor merited on any of Yurman's claims.

Even if, *arguendo*, triable issues exist as to liability for infringement, summary judgment would be appropriate now on Yurman's claim for damages for trade dress infringement. Yurman has indicated that it is not seeking lost profits. It is undisputed that Yurman has no direct evidence of willful deceit, which Yurman must establish to recover the only form of monetary relief sought in this case—Andin's profits.

## II.    Point One    Andin Is Entitled To Summary Judgment On The Issue Of Copyright Infringement As Yurman Cannot Prove Access

Yurman's claim for copyright infringement is bereft of merit for two separate reasons. First, Yurman cannot prove that Andin had access to Yurman's copyright. Second, even if

---

[2]    Upon being pressed, Mr. Yurman could only define his cable as "I know it when I see it," and upon then being asked to define a non-Yurman signature cable, he merely responded "that's a good question." *See* Azrielant Dec. Ex. Y at 104-05, 114.

Yurman could demonstrate access, Andin's accused products are not substantially similar to Yurman's copyright. As such, Yurman's claim for copyright infringement must fail, and Andin is entitled to summary judgment.

### A.    Standard of Review

The standard for summary judgment is well known. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only where there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[3] "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[4]

The moving party bears the burden of showing that it is entitled to summary judgment.[5] A party moving for summary judgment may discharge its burden "by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."[6] A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law."[7] An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party

---

[3]    Fed. R. Civ. P. 56(c); *Globecon Group v. Hartford Fire Ins.*, 434 F.3d 165, 170 (2d Cir. 2006).

[4]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Distasio v. Perkin Elmer*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006).

[5]    *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[6]    *Celotex*, 477 U.S. at 325.

[7]    *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[8]    *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

must come forward with specific facts showing that there is a genuine issue for trial."[9]  "[T]he mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. [10]  As such, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth concrete particulars, showing that a trial is needed.[11]

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."[12]  The parties may only carry their respective burdens by producing evidentiary proof in admissible form.[13]

**B.    Law with Regard to Access**

To prevail on its claim of copyright infringement, Yurman must establish: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[14]  In the present action, Yurman's ownership of a valid copyright is undisputed.  The only dispute concerns the issue of copying.  To satisfy the "copying" element of an infringement claim, Yurman "must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'"[15]  "[C]opying may be established by direct

---

[9]    *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).  *See also Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)); *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).

[10]    *Anderson*, at 247-48.  *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004)

[11]    *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

[12]    *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson*, 477 U.S. at 248.

[13]    Fed.R.Civ.P. 56(e).  *See also U.S. v. Diebold, Inc.*, 369 U.S. 654 (1962).

[14]    *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

[15]    *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

or indirect evidence.'"[16]  "Indirect evidence may include proof of 'access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.'"[17]

## C.    Yurman Cannot Prove Copying Because There Was No Access

Andin is a designer, manufacturer and marketer of jewelry and its customers include major retailers throughout the United States.    (Azrielant Dec. at ¶ 2).    Andin creates approximately 4,000 new jewelry products each year.  (*Id.*).  Yurman alleges ownership of United States Copyright Registration No. VA 1-024-276, issued August 21, 2000 for a work entitled Pave Collection Enhancer D06384 (hereinafter "the Yurman Enhancer").  (*Id.* at Ex. A)

In early 2007, Mr. Azrielant was given a ring by Mr. Moshe Vardi, of Vardi Gem Lustre LLC, who sought to interest Mr. Azrielant in a business transaction. (Azrielant Dec. at ¶ 6).  The ring remained in Mr. Azrielant's possession until this action commenced.  (*Id.*).  An image this ring (the "Vardi Ring") (Azrielant Dec., Ex. B) is included at Figs. 1 and 2 of the Appendix below.

As can be seen, the Vardi Ring has the following elements: (1) a central pave dome with a north-south orientation; (2) a somewhat rounded rectangular gold band surrounding said dome; (3) a silver step surrounding the gold perimeter; and (4) a skirt formed of a three-rope tier descending the silver step.  (*Id.* at ¶ 8).  When the Vardi Ring is worn, the longer side of the rectangle formed by the band lies along the finger of the wearer, on a north-south axis.  (*Id.*). The Vardi Ring – or one that was substantially similar – was featured in a Mother's Day advertisement from Macy's in 2006.  (*Id.* at ¶ 9 and Ex. C).  Mr. Azrielant liked the overall design of the Vardi Ring, but determined that it needed substantial modification to be successful for Andin in the marketplace.  (*Id.* at ¶ 10).  Consequently, Mr. Azrielant gave the Vardi Ring to

---

[16]    *Jorgensen*, 351 F.3d  at 51 (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001)).

[17]    *Boisson*, 273 F.3d at 267 (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992)).  *See also* Melville B. Nimmer & David Nimmer, Nimmer on Copyright (hereinafter, "Nimmer") § 13.02[B] (2008 Ed) ("In order to demonstrate defendant's copying as a factual matter, plaintiff must prove the twin ingredients of probative similarity plus access.")

Ramona Azulay, Andin's Director of Merchandising, for inspiration and re-design, and to consider it for inclusion in the Andin silver ring collection. (*Id.* at ¶ 10; Azulay Dec. at ¶ 5)

Using the Vardi Ring for inspiration, Ms. Azulay worked with Andin's designers to create a variation for a new ring, including changing the orientation of the ring so that when it is worn, the longer axis of the rectangular band which surrounds the pave dome lies along an east-west axis across the wearer's finger. (Azrielant Dec. at ¶ 11; Azulay Dec. at ¶ 7). A polished silver frame or step around the pave field was also eliminated, and the overall size of the ring, including the rope, was diminished. (Azrielant Dec. at ¶ 11; Azulay Dec. at ¶ 7). A copy of the Andin Ring is shown in Figs. 3-4 of the appendix below.

At the time Mr. Azrielant received the Vardi Ring in early 2007, the Yurman Enhancer was unknown to him, and remained unknown to him until the present dispute started. (Azrielant Dec. at ¶ 12). Furthermore, Mr. Azrielant had not seen any advertising or promotion for the Yurman Enhancer. (*Id.*). Ms. Azulay, who oversaw the design of the new ring, had never seen the Yurman Enhancer prior to this dispute. (Azulay Dec. at ¶ 10). Both Mr. Azrielant and Ms Azulay first saw the Yurman Enhancer after purchasing it from Defendant Yurman's store on Madison Avenue, New York, on January 29, 2008. (Azrielant Dec. at ¶ 12; Azulay Dec. at ¶ 11). It is important to note that Andin's salespeople, who were not involved with the creation of Andin's accused products, never came into contact with the Yurman Enhancer. (Williams Dec. at ¶ 14; Lyle Dec. at ¶ 10). Indeed, Gail Campbell, a buyer of jewelry for Sam's Club – one of the largest jewelry retailers in the country – had not seen the Yurman Enhancer prior to the current dispute. (Azrielant Dec. Ex. Z at 87-88). Similarly, Terry Ghirozi, a buyer for JC Penney – also one of the largest jewelry retailers in the country – had not seen the Yurman Enhancer prior to this dispute. (Azrielant Dec. Ex AA at 79-80)

The only jewelry that served as inspiration for Andin's accused products was the Vardi Ring. (Azrielant Dec. at ¶ 13; Azulay Dec. at ¶ 9)

Access is defined as having the reasonable opportunity to copy.[18]  Here, Yurman's ability to prove access would be based merely on speculation or conjecture, not significant, affirmative or probative evidence.  The Yurman Enhancer does not even appear on Yurman's website. (Azrielant Dec. at ¶ 14 and Ex. E).  Significantly, prior counsel for Andin inspected several known major retailers of Yurman's products throughout the country, and no such piece was found at these locations. (Azrielant Dec. Ex. F at ¶ 7)

As there was no advertising of the Enhancer for at least a year prior to the creation of the accused product, and availability was scant at best, Yurman cannot prove access.  Without such proof, Yurman's claim of copyright infringement must fail.  Because Yurman cannot establish access here, summary judgment must be granted in favor of Andin, dismissing Yurman's copyright infringement claims.

## III.    <u>Point Two</u>      <u>Andin Is Entitled To Summary Judgment On The Issue of Copyright Infringement As The Accused Products Were Independently Created</u>

Independent creation is a complete defense to an allegation of copyright infringement.[19]

The details surrounding the creation and development of the Andin Ring are set forth above.  In short, the Andin Ring was inspired by the Vardi Ring supplied to Mr. Azrielant by Mr. Vardi. (Azrielant Dec. at ¶ 13; Azulay Dec. at ¶¶ 7, 9).  As such, there can be no doubt that the Andin Ring was independently created, and Andin is therefore entitled to summary judgment. Interestingly, as discussed in further detail below, David Yurman himself admitted that the Andin Ring does not infringe the copyright in the Yurman Enhancer. (Azrielant Dec. at ¶ 27)

The Andin Ring was first shown by Andin at the JCK jewelry show in Las Vegas, in June 2007. (Azrielant Dec. at ¶ 16; Williams Dec. at ¶ 15).  Tellingly, no one who saw the Andin Ring commented that it looked like another product – such as Yurman's. (*Id.* and Lyle Dec. at ¶ 16).  Customers requested that the Andin Ring be offered along with an ensemble, comprised of

---

[18]      *Tomasini v. The Walt Disney Co.*, 84 F.Supp.2d 516, 519 (S.D.N.Y. 2000) (quoting *Favia v. Lyons Partnership*, 1996 U.S. Dist. LEXIS 5306 (S.D.N.Y. 1996)).

[19]      *See Maharam v. Patterson*, 84 U.S.P.Q.2d 1056 (S.D.N.Y. 2007).

a pendant (hereinafter the "Andin Pendant") and a pair of earrings (hereinafter the "Andin Earrings"). (Azrielant Dec. at ¶ 17 and Exs. G and H). The Andin Pendant and Andin Earrings were created solely to match the Andin Ring and without reference to any other products. (*Id*)

It was only after showing the Andin Ring at the June 2007 JCK Show that Andin, at the request of its customers, developed the Andin Pendant and Andin Earrings inspired by the Andin Ring. In light of the foregoing, it is undisputed that the Andin Ring, Andin Pendant and Andin Earrings were created independently of the Yurman Enhancer. Accordingly, summary judgment on this issue is warranted.

IV.    <u>Point Three</u>    **Andin Is Entitled To Summary Judgment On The Issue Of Copyright Infringement As The Accused Products Are Not <u>Substantially</u> Similar to the Yurman Enhancer**

Yurman admits, as it must, that the elements of the Yurman Enhancer – a central pave field, a gold frame, and a cable frame – are all common elements and not subject to protection. The protectable elements of the Yurman Enhancer are not copied, and, as such, summary judgment is warranted in Andin's favor.[20]

A.    <u>The Elements of the Yurman Enhancer Are All In The Public Domain</u>

The Yurman Enhancer is depicted at Figures 5 and 6 of the appendix below. (Azrielant Dec. Ex. K ¶ 20). As can be seen, the elements of the Yurman Enhancer are: (1) a diamond pave rectangular center (which Yurman refers to as a cushion) in a north-south alignment; (2) a stepped, double gold frame surrounding the pave field; (3) a thick single sculpted cable design below and surrounding the gold frame, sculpted in a clockwise direction; (4) a polished silver outer frame; (5) a gold crown at the top of the pendant; (6) a gold crown at the bottom of the bale; and (7) silver piping surrounding a silver sculpted cable bale. (Azrielant Dec. Ex. K; Azulay Dec. at ¶ 15)

---

[20]    Interestingly, this was the same conclusion that was alluded to by Judge Cedarbaum and a leading commentator, William F. Patry (author of <u>Patry on Copyright</u>). *See* Azrielant Dec. ¶ 19 and Ex. J.

The use of a pave central field is well known. (Azrielant Dec. at ¶ 21 and Ex. L; Azulay Dec. at ¶ 17). Likewise, there are numerous uses of rounded stones – or as Yurman refers to it, "cushions" – as the central focal point of a piece of jewelry. (Azrielant Dec. at ¶ 22 and Ex. M; Azulay Dec. at ¶ 18). Additionally, gold "framing" of a central stone – including pave diamond cushions – is something which has existed long before Yurman. (Azrielant Dec. at ¶ 23 and Ex. N; Azulay Dec. at ¶ 19). Finally, cable jewelry has been used for centuries. (Azrielant Dec. at ¶ 24 and Ex. O; Azulay Dec. at ¶ 20). David Yurman even admitted that he has no claim to cable itself. (Azrielant Dec. Ex Y at 104 ("No, I do not own cable. I'd have a problem with the Brooklyn Bridge. It's not mine.") Designs in the prior art are also included at **Figures 7 and 8** in the appendix below. Not surprisingly, there are several products on the market today made by third parties that have some or all of these features. (Azrielant Dec. at ¶ 25 and Ex. P; Azulay Dec. at ¶ 21). Some of these pieces that have been available for purchase in the past few years are depicted below – indeed, these pieces all were in the same Macy's catalog in 2006. (Azrielant Dec. Exs. C, P and X). These pieces are shown in Figs. 8, 17 and 18 of the Appendix.

**B.    Standard of Review: The More Discerning Ordinary Observer Test**

In light of the foregoing, as even Yurman must admit, many other jewelry companies are making the same or similar designs using the same, or similar elements as those present in the Yurman Enhancer. Furthermore, as outlined above, these elements existed prior to Yurman's copyrighted designs. This means that enforcing Yurman's copyright as broadly as it seeks would effectively preclude the public from using elements that were in the public domain *prior* to the existence of the Yurman Enhancer.

The copyright covering the Yurman Enhancer should extend only to the elements which were contributed by Yurman, as distinguished from the work that previously existed. As the Supreme Court explained:

> [I]f an author attempts to copyright a novel, e.g., about Cinderella, and the story elements are already in the public domain, the author

holds a copyright in the novel, *but may receive protection only for his original additions* to the Cinderella story.[21]

Put another way, "material found in the public domain . . . is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work."[22]  In instances where the copyright contains elements that are both protectable and *un*protectable, the Second Circuit has applied the "more discerning ordinary observer" test.[23]  The extra discernment required by this test focuses the fact finder on similarities that relate only to protectable material.[24]

The "more discerning" ordinary observer standard was explained by the Second Circuit in *Folio Impressions, Inc. v. Byer California.*[25]  In short, this test is applied when a work contains both protectable and unprotectable elements, and requires the fact finder to first eliminate the unprotectable elements from its consideration and to ask whether the protectable elements, standing alone, are substantially similar.[26]  However, the discerning ordinary observer test is also "guided by comparing the 'total concept and feel' of the contested works."[27]  This has long been the rule.[28]  Additionally, the level of scrutiny of the more discerning ordinary observer must take into account that "[c]ommonly used elements of jewelry design are not entitled to copyright protection."[29]

---

[21]     *Stewart v. Abend*, 495 U.S. 207, 224 (1990) (emphasis added).

[22]     *Computer Assocs. Int'l Inc. v. Altai Inc.*, 982 F.2d 693, 710 (2d Cir. 1992).

[23]     *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. N.Y. 1995); *Fisher-Price, Inc. v. Well-Made Toy Mfg. Co.*, 25 F.3d 119, 122 (2nd Cir. 1994).

[24]     <u>Nimmer</u> at § 13.03; 3 Patry on Copyright § 9:74

[25]     937 F.2d 759, 766 (2d Cir. 1991).

[26]     *Folio Impressions*, 937 F.2d at 765-66.  *See* <u>Nimmer</u> at §13.03[F] ("Infringement is shown by a substantial similarity of protectable expression, not just an overall similarity between the works.").

[27]     *Boisson*, 273 F.3d at 272.

[28]     *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (explaining "abstractions" test for comparing only protectable elements).

[29]     *Ripka Designs, Ltd. v. Penny Preville, Inc.*, 935 F.Supp. 237, 248 (S.D.N.Y. 1986).

### C.     The Andin Ring Does Not Infringe Yurman's Copyright

The most telling point here is that David Yurman initially agreed that the Andin Ring did not infringe upon Yurman's copyright to the Yurman Enhancer.  On January 23, 2008 David Yurman called Mr. Azrielant and complained that the Andin Pendant and the Andin Earrings infringed Yurman's rights in the Yurman Enhancer.  (Azrielant Dec. at ¶ 27).  When the conversation turned to the Andin Ring, Mr. Yurman indicated that he did not have an issue with the Andin Ring and stated that the Andin Ring had been included in the cease and desist letters because of an error by Defendant Yurman's in-house counsel.  (*Id.*)

As discussed above, the Yurman Enhancer is characterized by the following features: a central pave field; a double frame of somewhat squarish shape with rounded corners surrounding the pave field, the double frame including a thin inner step and somewhat thicker outer frame; a single, clockwise running sculpted cable design surrounding the double frame; and finally, a thick, polished outer frame surrounding the clockwise cable.  (Azulay Dec. at ¶ 15).  All of these components are attached to a bale by a crown, and the bale is comprised of a single cable located between two lines of piping.  (*Id.* at ¶ 16).  The bale features a snap closure that allows the wearer to attach the enhancer to a variety of other jewelry items.  (*Id.*)

Obviously, the items themselves have different orientations – the Andin ring has an "east-west" orientation whereas the Yurman Enhancer has a "north-south" orientation.  (*Id.* at ¶ 23).  In contrast, the Andin Ring has a rectangular pave field with rounded corners, surrounded by an inner frame, which in turn is surrounded by a cable.  (*Id.*).  However, the cable on the Andin Ring is triple stacked, and appears as twisted tubing rather than as a sculpted design.  (*Id.*).  Likewise, the cable on the Yurman Enhancer runs clockwise, while the cable on the Andin Ring runs counter-clockwise.  (*Id.*).  The Andin Ring features a three-cable tier descending from the inner frame, and has no outer polished frame.  (*Id.*).  Obviously, the Andin Ring has no bale and has no crown connecting its body to a bale.  (*Id.*).  The differences between the Andin Ring and the Yurman Enhancer are apparent from reviewing the Fig. 9 of the appendix, which provides a side-by-side comparison of the two pieces.  (Azrielant Dec. Ex. R)

- 11 -

Clearly, the two items have a very different look and feel, the elements appear very different, and no observer – whether an ordinary observer or a more discerning observer – would consider these two pieces to be substantially similar. Accordingly, and especially in light of Mr. Yurman's admission, summary judgment is appropriate here.

**D.      The Andin Earring Does Not Infringe Yurman's Copyright**

As stated above, the Andin Earring was based on the Andin Ring – meaning that there could not be an unlawful copying. More significantly, the items are not substantially similar, whether from a more discerning observer or ordinary observer standpoint. Top, side and rear view comparisons are included at Figs. 10-12 of the appendix below. (*See* Azrielant Dec. Ex. S)

As with the Andin Ring, the Andin Earring has a very different overall look and feel than the Yurman Enhancer. (Azulay Dec. at ¶ 24). The pave field is different, as is the proportion of pave to the entire piece. (*Id.* at ¶ 25). In the Yurman Enhancer, the gold frame abuts the pave field, whereas in the Andin Earring it does not – there is a noticeable space between the gold frame and the structural frame around the pave field. (*Id*). The cable on the Andin Earring looks like twisted piping and is twisted in a counter-clockwise direction, whereas the cable on the Yurman Enhancer appears to be sculpted, and has a much thicker look and feel and is twisted in a clockwise direction. (*Id*). The Andin Earring does not have the high polished silver outer edge, nor does it have the structural pieces of the bale detailed above (i.e. the crown, piping, etc.). (*Id.*). Once again, the two items have a very different look and feel, the elements appear very different, and no observer – whether an ordinary observer or a more discerning observer – would consider these two pieces to be substantially similar. Accordingly, summary judgment on this issue is appropriate here.

**E.      The Andin Pendant Does Not Infringe Yurman's Copyright**

As with the Andin Earring, the Andin Pendant was based on the Andin Ring – meaning that there could not be unlawful copying. By way of background, an enhancer (i.e. the item sold by Yurman) has a bale-like component that may be opened to fit over a variety of pieces, such as a strand of pearls or beads, and then locked closed. (*Id.* at ¶ 28). An enhancer is meant to slide

onto the chain rather than to be soldered to it so that it is not permanently part of the chain. (*Id.*). The Andin pendant, on the other hand, is an ornament designed to be suspended from a chain or necklace and cannot be clipped. (*Id.*). As with the Andin Ring and the Andin Earring, the items are not similar. Top, side and rear view comparisons of the Andin Pendant and the Yurman Enhancer are included at Figs. 13-15 of the Appendix. (*See* Azrielant Dec. Ex. T)

The Andin Pendant has a very different overall look and feel than the Yurman Enhancer. (Azulay Dec. at ¶ 26). The pave field is different, as is the proportion of pave to the entire piece. (Azulay Dec. at ¶ 27). In the Yurman Enhancer, the gold frame abuts the pave field, whereas in the Andin Pendant it does not – there is a noticeable space between the gold frame and the structural frame around the pave field. (*Id.*) The cable on the Andin Pendant is triple stacked in a counter-clockwise direction, looks like twisted piping, and has a totally different look and feel than the sculpted cable twisted in a clockwise direction which is contained in the Yurman Enhancer. (*Id.*) The Andin Pendant does not have the high polished silver outer edge. (*Id.*) Finally, the bale for the two pieces are entirely different. (*Id.*) The Andin Pendant and Yurman Enhancer have a very different look and feel, the elements appear very different, and are not substantially similar as a matter of law. Accordingly, summary judgment on this issue is appropriate here.

V.     **Point Four     Andin is Entitled to Summary Judgment on the issue of Trade Dress Infringement as Yurman cannot Demonstrate That its Trade Dress has Acquired Secondary Meaning**

To succeed on its Lanham Act claims, Yurman must demonstrate: (1) that it owns a trade dress; and (2) that Andin's use of the trade dress is likely to cause confusion.[30] Yurman's trade dress is limited to product configuration – namely, (i) an elongated pave "cushion"; (ii) encircled by a smooth band of gold, providing the appearance of a platform; (iii) encircled by an outside trim of Yurman's signature cable design.[31] The Supreme Court has indicated that trade dress

---

[30]     *See Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

[31]     *See* Yurman's Amended Answer and Counterclaim at ¶ 69.

claims seeking protection on product configuration must be viewed with special caution because protecting an ordinary design would be tantamount to creating a monopoly in the actual goods.[32] As such, to demonstrate ownership here, Yurman must show that its trade dress has acquired secondary meaning – namely, that consumers recognize that the trade dress comes from a single source.[33] This is a burden Yurman cannot overcome. As such, summary judgment is warranted.

### A. Governing Law

Secondary meaning is a term of art referencing the ability of the trade dress to identify the source of the product rather than the product itself.[34] In simple terms, to show it has acquired secondary meaning, Yurman must be able to establish that the trade dress at issue here is identifiable to Yurman. A secondary meaning analysis takes into account six factors that bear on the extent to which the "consuming public for a particular product" associates that product with its source on the basis of its trade dress: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."[35]

### B. Yurman Cannot Demonstrate Evidence of Secondary Meaning

#### (i) Insufficient Advertising

Advertisements are only relevant here to the extent they feature the trade dress at issue in this case.[36] In the ten years since the trade dress was created, Yurman has only produced a few catalogues depicting the product – and none for at least the last three years – demonstrating that its advertising and promotion of this product was minimal. (Azrielant Dec. Ex. U). In these ten years, Yurman has not had a single advertisement showing the 3 items together. Indeed, the catalogues produced by Yurman feature several items and do nothing to promote Yurman's

---

[32]    *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213, (2000).

[33]    *Wal-Mart Stores*, 529 U.S. at 213; *Qualitex Co. v. Jacobson Prods.*, 514 U.S. 159, 163 (1995).

[34]    *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 167 (2d Cir. 2007)

[35]    *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995).

[36]    *Centaur Comms., Ltd. v. A/S/M Comms., Inc.*, 830 F.2d 1217, 1222-23 (2d Cir. 1987); *Johnson & Johnson v. Actavis Group hf*, 2008 U.S. Dist. LEXIS 17680 (S.D.N.Y. 2008)

alleged trade dress – to the contrary, the catalogues demonstrate only that Yurman tried to sell these pieces, in addition to several others that do not feature the trade dress.

Tellingly, Yurman's 2008 catalogues do not feature any of these pieces on display. (Azrielant Dec. Ex. V). Likewise, Yurman's in-store displays do not feature this trade dress. (Azulay Dec. at ¶ 13). Further, throughout the pendancy of this action, Yurman's web-site has not had any of the pieces covered by the alleged trade dress on display. (Azrielant Dec. at ¶ 14). Although Yurman has produced confidential summaries of advertising expenditures for certain products, no copies of the advertisements themselves were produced, rendering the same irrelevant, as there is no proof of what the advertisements looked like, or whether the trade dress itself was featured.

Simply put, the only proof of promotion put forth by Yurman does not emphasize the trade dress – it merely includes individual trade dress items together with many other items being offered for sale – and the overwhelming majority of items featured are not part of the trade dress.

### (ii)    No Consumer Studies

Despite the fact that Yurman has been involved in a variety of trademark cases, and the fact that it asserts that its trade dress is well known, Yurman has never done a relevant market study. Such studies were requested in discovery and Yurman was clear that it never has done such a study. (See Azrielant Dec. Ex. Y at 85-87). This demonstrates that there is no objective indication that the relevant consuming public associates the trade dress at issue with Yurman. When confronted with testimony that various witnesses were unaware of his alleged trade dress, Mr. Yurman resorted to disparagement (See Azrielant Dec. Ex. Y at 53-56). – something far short of scientific or objective evidence.

### (iii)    No Unsolicited Media Coverage of Yurman's Trade Dress

Yurman produced no unsolicited media coverage. Again, this media coverage would be very important, as it would show that objective third parties have seen the trade dress at issue and identified it with Yurman.

- 15 -

(iv)    No Sales Success for the Yurman Trade Dress

Yurman has produced only summary sheets of its sales, without any back-up documentation. However, even if this documentation is correct, Yurman has sold less than 12,000 units that have the trade dress at issue. since it was created 10 years ago. (*See* Caire Aucoin Dec. (under seal) at Ex. A-1) More important, in each of the last two years, Yurman has sold less than 500 total (pendants, earrings, and rings combined) products featuring the trade dress. (*See* Caire Aucoin Dec. (under seal) at Ex. A-1)

Yurman has not shown that the trade dress has sustainable sales success. Indeed, despite the fact that Yurman has produced these summary spreadsheets, it is unclear that these items are even being sold. Witnesses have been unable to find these items in retail stores, including Yurman's own retail stores. (*See* Azrielant Dec. at ¶ 15; Azulay Dec. at ¶¶ 12, 13, 14). Indeed, when trying to purchase the ring, witnesses could not locate the items anywhere outside of Florida. (Azulay Dec. at ¶ 14). This corresponds with the fact that the alleged trade dress is not even displayed on Yurman's web-site or shown in Yurman's 2008 catalogues.

(v)    No Evidence of Plagiarism

Yurman has produced no evidence of "plagiarism" – indeed, it is unclear that Yurman is even the first to have used this trade dress, as Yurman has not proceeded against any of the third parties that have been utilizing similar trade dress.

(vi)    Yurman Has No Period of Exclusivity of Use

As indicated above, all of the elements of Yurman's trade dress have been in existence and even combined – at least to some degree – prior to the time that Yurman's trade dress came into existence. Many of the products displayed combine these elements and are similar. While the precise configuration of the prior art may not be identical, it is clear that they have the same look, feel and connotation. Thus, if the Andin pieces are adjudged to infringe the Yurman copyright and/or trade dress, then the copyright and/or trade dress must be invalid. Additionally, during the last several years there have been several products on the market that use the same or

visually similar elements. (See Azrielant Dec. Ex. X). Some of these products are included at Figures 16-18 in the appendix.

It is clear that there have been various products that have included some or all of the elements of Yurman's alleged trade dress. Further, Yurman has not provided any evidence to demonstrate *any* exclusivity of use, or that it has ever taken action against the entities distributing the items with a similar trade dress.

### (vii)    Conclusion on Secondary Meaning

Yurman has not produced sufficient evidence to demonstrate that its trade dress has achieved secondary meaning. It has not demonstrated any objective criteria – such as unsolicited media coverage, consumer studies, attempts to plagiarize, or length and exclusivity of use. Further, Yurman has not demonstrated that its advertising or sales – of which its evidence is equivocal at best – was sufficient to create a genuine issue of fact. Accordingly, Yurman cannot establish that its alleged trade dress has achieved secondary meaning and, as such, Andin is entitled to summary judgment.

**VI.    Point Five    Andin Is Entitled To Summary Judgment On The Issue of Trade Dress Infringement As Yurman Cannot Articulate A Distinct Trade Dress**

Yurman must articulate the specific elements which comprise its distinct trade dress, and a precise expression of the character and scope of the claimed trade dress.[37] In its complaint, Yurman alleges that the first feature of its trade dress is a pave field shaped in "an elongated cushion design," meaning a rectangle with rounded edges. (*See* Yurman's Amended Answer and Counterclaims at ¶ 69). Yet, in the spirit of Yurman's ever changing trade dress claim, at his deposition, Mr. Yurman stated that the trade dress could actually include a *square* – that is that the trade dress did not need to be an elongated cushion. (*See* Azrielant Dec. Ex. Y at 31-33).

---

[37]     *Yurman*, 262 F.3d at 115-16; *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997).

- 17 -

Yurman alleges that the second element of the trade dress is "a smooth band of yellow gold." (*See* Yurman's Amended Answer and Counterclaims at ¶ 69). Yet, unlike the enhancer, the very ring on which Yurman's trade dress is based departs from the definition above by including a silver band in between the pave field and gold frame, and the gold band is a step shape.

Finally, Yurman alleges that the third element of the trade dress is "an outside trim of Yurman's signature cable design" which "encircle[s]" the gold band. (*Id.*) First, in the Yurman ring, the cable does not encircle the gold band. Second, Yurman's "Signature Cable" is a fictional element – there is no consistent definition, nor could Yurman's witnesses provide any meaningful definition. Janet Hayward, Yurman's VP of Design, was shown pictures of a large variety of pieces of jewelry containing cable designs. Ms. Hayward identified the vast majority of them as "David Yurman's Signature Cable" (including some pieces that are centuries old). Realizing that she practically claimed every cable created by man as "David Yurman's Signature Cable," she then tried to explain:

> If you are looking at David Yurman, it's David Yurman's signature cable, if you are looking at a piece of David Yurman jewelry.
>
> * * *
>
> It's the cable that David Yurman himself looks at, torques, designs to, applies. It is his hand, his signature.
>
> * * *
>
> But again, there is a variety. But overall, it has a certain proportion, a certain finesse.
>
> However, again, I'm very close to the product. Your average consumer is not going to identify these subtleties like I can when you ask me these questions. I know what David Yurman will ask me to change if it's not the right proportion. The average consumer does not see that, the way we do it.
> * * *
> It's visual, aesthetic to David Yurman's eye.

*See* Azrielant Dec. Ex. Q. at 150-54 and 208-10.

- 18 -

When called to clarify the explanation of the "Signature Cable," Mr. Yurman himself provided less clear testimony, at one time stating: "No, I do not own the cable. I'd have a problem with the Brooklyn Bridge. It's not mine." Yet, when pressed to define his "Signature Cable," he offered, "You know it when you see it." When pressed to then define "A Non-David Yurman Signature Cable," he merely responded, "That's a good question." Finally, Mr. Yurman stated that "The cable itself is not signature." (Azrielant Dec. Ex. Y at 103-06, 114). Thus, although David Yurman, by his own admission, does not own cable jewelry, Yurman cannot define what his "signature cable" is, meaning that it is at Yurman's whim to determine whether a cable design a competitor creates infringes on this trade dress.

It is clear that the only consistency in Yurman's alleged trade dress is inconsistency. Indeed, it appears that Yurman is simply claiming a trade dress in public domain elements – there is not a single feature of Yurman's alleged trade dress which can be defined with any sort of precision. As such, Yurman's trade dress fails as a matter of law and Andin is entitled to summary judgment.

## VII.    Point Six        Andin is Entitled to Summary Judgment On The Issue of Trade Dress Infringement As Yurman Cannot Demonstrate A Likelihood of Confusion

Yurman must also demonstrate that the allegedly infringing products are likely to confuse consumers about their source or identity.[38] Yurman's burden in this regard is to demonstrate a "probability" -- not merely a "possibility" -- of confusion.[39] Critical to such an analysis are the eight so-called *Polaroid* factors."[40] Those factors are: (1) strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which

---

[38]    *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 118-19 (2d Cir. 2001).

[39]    *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir. 1996)

[40]    *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)

the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group.[41]

Yurman cannot demonstrate that these factors bode in its favor here.

### A.    Application of the Polaroid Factors

#### (i)    Yurman's Trade Dress is Not Strong

The strength of a trademark or trade dress is determined by its "tendency to identify the goods sold under the mark as emanating from a particular . . . source."[42] The strength of a trademark or trade dress measures "its power to identify the source of a product."[43] Here, the strength of Yurman's trade dress would be based upon its acquired distinctiveness – namely, secondary meaning.[44] The points in this regard would be the same as those detailed above. To the extent that Yurman could avoid summary judgment on the issue of secondary meaning, it would still have a very weak trade dress. Simply put, all of the objective criteria demonstrate that Yurman's trade dress is non-existent. As such, to the extent that Yurman could urge a creative interpretation of its limited sales and unsubstantiated advertising, Yurman would be able to establish only a very weak trade dress.

#### (ii)    The Trade Dresses At Issue Are Not Similar

When the secondary user's trade dress is not identical but merely similar to the plaintiff's trade dress, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused.[45] Here, as detailed above in the copyright section, Andin has provided evidence that the products at issue are dissimilar. More important, the

---

[41]    *Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005) (quoting *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004)).

[42]    *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003).

[43]    *Time, Inc. v. Petersen Pub. Co. LLC*, 173 F.3d 113, 117 (2d Cir. 1999); see *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991) (noting that "the strength of the mark turns on its origin-indicating quality[] in the eyes of the purchasing public" (internal quotation marks omitted)).

[44]    *Playtex Prods., Inc.*, 390 F.3d 158, 163 (2d Cir. 2004) (internal quotation marks omitted)

[45]    *Virgin Enters*, 335 F.3d at 149.

Yurman trade dress includes Yurman's logo, which is absent from Andin's accused products. As such, there can be no claim that the products are similar.

(iii)    Proximity and Bridging the Gap

The proximity of products inquiry concerns "whether and to what extent the two products compete with each other."[46] In assessing this factor, courts consider "the nature of the products themselves and the structure of the relevant market." If the products "serve the same purpose, fall within the same general class or are used together, the use of similar designations is more likely to cause confusion."[47] Where the goods are not directly competitive, courts also examine the related factor of "bridging the gap," which "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."[48]

Even though both items at issue are jewelry, the differences between the channels of trade in which each product is distributed demonstrates that the products do not compete with one another. For purposes of this matter, there are three distinct types of jewelry retailers: (1) luxury retailers; (2) mid market retailers; and (3) discounters. (*See* Azrielant Dec. at ¶ 38). The luxury retailers market to individuals with a great deal of disposable income – individuals or households in top income brackets (i.e. annual incomes of $125,000 or more). (*Id.* at ¶ 39). On the other hand, mid market retailers focus on individuals with a typical household income of between $40,000 and $90,000. (*Id.* at ¶ 40).

Andin's jewelry sells to mid-market retailers and jewelry discounters, here, JC Penney and Sam's Club. (*See* Azrielant Dec. at ¶¶ 42-44). Yurman's jewelry is sold only where luxury brands are sold, in retailers such as Neiman Marcus, Saks Fifth Avenue, and Bergdorf Goodman. (*See* Azrielant Dec. at ¶¶ 39, 43). In turn, the stores in which the respective products are sold attract different consumers with different expectations. (*See* Azrielant Dec. at ¶¶ 39, 40).

---

[46]    *Cadbury Beverages*, 73 F.3d at 480.

[47]    *Lang*, 949 F.2d at 582.

[48]    *Star Indus.*, 412 F.3d at 387.

- 21 -

Moreover, there is a large difference in the price-point of these items. The accused jewelry is sold at retail for between $200 and $300. (*See* Azrielant Dec. at ¶ 45). Yurman's price for these items is never sold for less than about $1,400.00 – and Andin spent more than $3,000 to purchase Yurman's ring. (*See* Azrielant Dec. at ¶ 45; Azulay Dec. at ¶30).

Andin sells its jewelry to mid-market retailers and discounters. (Azrielant Dec. at ¶ 42). Yurman will not sell to these retailers. (*Id.* at ¶ 42 and Ex. Q at 48-63; Ex. Y at 89-96). Yurman sells its jewelry only to luxury retailers. (Azrielant Dec. at ¶ 43). Andin does not sell its jewelry to luxury retailers. (Azrielant Dec. at ¶ 43).

Therefore, despite the fact that both items are jewelry, Yurman cannot dispute that the goods are sold or distributed through different channels of trade and do not compete with one another.

(iv)    There Has Been No Actual Confusion

Although evidence of actual consumer confusion is particularly relevant to a trade dress infringement action[49] the absence of actual confusion alone is not dispositive of the question of likelihood of confusion.[50] There is no actual confusion here. Despite the obvious importance of this *Polaroid* factor, Yurman has presented no evidence whatsoever of any actual confusion between Andin's and Yurman's products. This demonstrates the real world effects here. Indeed, Andin has distributed more than 10,000 of the accused items in less than a year – many of them with the consent of Yurman (*See* Azrielant Dec. at ¶ 45) – compared to approximately 500 units sold by Yurman in the corresponding period. Yet, notwithstanding the foregoing, there has been no evidence of confusion. As such, like the other factors, this factor weighs heavily in favor of a finding of no confusion.

---

[49]    *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998),

[50]    *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)

- 22 -

(v)     No Bad Intent By Andin

The good faith inquiry considers whether Andin adopted its trade dress with the intention of capitalizing on Yurman's reputation and goodwill and on the potential of confusion between the products.[51]  The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search."[52]  Here, as stated in the context of the copyright, Andin did not have any knowledge of Yurman's trade dress – nor did a variety of people with significant experience and positions in the industry. Significantly, the Yurman trade dress was never articulated to Yurman's employees prior to this action.  Accordingly, this factor also weighs in favor of a finding of no likelihood of confusion.

(vi)     Quality of Andin's Products

The quality factor is primarily concerned with whether Yurman's reputation could be jeopardized by virtue of the fact that Andin's product is of inferior quality.[53]  There is no evidence that Andin's products are of an inferior quality.

(vii)     Sophistication of Consumers

The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers.[54]  The more sophisticated the consumers, the less likely they are to be misled by similarity between the trade dresses.[55]

This is perhaps one of the most important points in this analysis.  People purchasing jewelry exercise a great deal of care when purchasing items.  (Azrielant Dec. at ¶¶ 46-51; Azulay Dec. at ¶ 29-39).  The environment for purchasing jewelry is not one with distractions; a consumer is presented with the ability to compare information and take time.  (Azrielant Dec. at

---

[51]     *Savin Corp.*, 391 F.3d at 460 (internal quotation marks and alterations omitted).

[52]     *Star Indus.*, 412 F.3d at 388.

[53]     *Star Indus.*, 412 F.3d at 389 (internal quotation marks omitted).

[54]     *Cadbury Beverages*, 73 F.3d at 480 (internal quotation marks omitted).

[55]     *TCPIP Holding*, 244 F.3d at 102.

¶¶ 49-51; Azulay Dec. at ¶ 37). In purchasing jewelry, consumers enjoy analyzing, processing and researching a product or brand before purchasing – especially luxury brands like Yurman. (Azrielant Dec. at ¶ 51; Azulay Dec. at ¶ 37). Because Yurman promotes a "lifestyle" more than jewelry itself, there is also an added social aspect to buying Yurman's jewelry which ensures that consumers would not be confused. (Azrielant Dec. at ¶ 39; Azulay Dec. at ¶ 39).

**B.    Conclusion on the Issue of Likelihood of Confusion**

None of the factors here support a finding of trade dress infringement. Accordingly, balancing the factors here would yield no likelihood of confusion and, as such, Andin's motion in this regard should be granted.

**VIII.  Point Seven    Andin is Entitled to Summary Judgment on the issue of Trade Dress Infringement as Yurman Cannot Demonstrate Actual Damages**

Yurman has indicated that the only monetary remedy it seeks in this case is Andin's profits, (Azrielant Dec. at Ex. BB), which requires Yurman to demonstrate that Andin acted with willful deception in order to recover damages.[56]  Thus, Yurman's ability (or inability as is the case) to show that Andin acted with "intent to deceive" consumers is determinative on Yurman's only claim for monetary damages for trade dress infringement. Even if Andin's accused products were found to infringe Yurman's products, proof of willful deceit would be a prerequisite to awarding Yurman the only damages it can claim in this case.

Yurman cannot prove that Andin acted with the deliberate intent to deceive consumers as to the source or affiliation of the accused Andin products (because he did not). There is no evidence that Andin deliberately intended to deceive consumers into believing its accused items originated from or were affiliated with Yurman.

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion

---

[56]    *See, e.g., Malletier,* 500 F.Supp. 2d at 280; *Gidatex v. Campaniello Imports Ltd.,* 82 F. Supp. 2d 136, 145 (S.D.N.Y. 2000).

between the two companies' products."[57]  Competitors are free to imitate aspects of a popular "look" so long as there is no intent to create, or creation of, confusion.[58]  Here, as detailed above, Andin was not aware of Yurman's trade dress.  As such, Andin could not have maintained an intent to deceive consumers.  Yurman has not and cannot point to any evidence to the contrary. Accordingly, because Yurman cannot prove bad faith or willful infringement, Andin is entitled to summary judgment with respect to Yurman's claims for damages Andin's profits.

## IX.    Conclusion

For all the reasons set forth in this memorandum, Andin respectfully requests that this Court grant its motion for summary judgment finding that: (1) Andin's products do not infringe the copyright owned by Yurman; (2) Andin's products were created independently from Yurmam's alleged copyright; (3) Yurman does not have a protectable trade dress; (5) Yurman's trade dress is not sufficiently defined; (6) even if Yurman has a protectable trade dress, it is not infringed by Andin; and (7) Yurman is not entitled to damages on its trade dress claim.

Respectfully submitted,

**TROUTMAN SANDERS LLP**

By: _____/s/_____
          Oren J. Warshavsky  (OW 9469)
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
Telephone: (212) 704.6213
Facsimile: (212) 704-8356
e-mail: Oren.Warshavsky@troutmansanders.com

*Attorneys for Plaintiff*

Dated:    June 19, 2008
          New York, New York

---

[57]    *Star Indus.*, 412 F.3d at 388; *see also Arrow Fastener*, 59 F.3d at 397;  McCarthy at § 23:110 ("[T]he only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse.").

[58]    *Basch*, 968 F.2d at 1541; *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).

**Figure 1 – Vardi Ring (Top View)**



**Figure 2 – Vardi Ring (Side View)**



**Figure 3 - Andin Ring (Top View)**



**Figure 4 - Andin Ring (Side View)**



**Figure 5 - Yurman Enhancer (Front View)**



**Figure 6 - Yurman Enhancer (side and back views)**



**Figure 7 - Prior Art**



**Figure 8 - Items Advertised by Macy's in 2006**



**Figure 9 - Comparison of Andin Ring and Yurman Enhancer (front view)**



**Figure 10 - Comparison Between Andin Earrings and Yurman Enhancer (front view)**



**Figure 11 - Andin Earring and Yurman Enhancer (Side View)**



**Figure 12 - Andin Earring and Yurman Enhancer (rear view)**



**Figure 13 - Andin Pendant and Yurman Pendant (front view)**



**Figure 14 - Andin Pendant and Yurman Pendant (side view)**



**Figure 15 - Andin Pendant and Yurman Enhancer (rear view)**



**Figure 16 - Yurman's Alleged Trade Dress**



**Figure 17 - Products Purchased By Andin Subsequent to Yurman's Trade Dress Claim**



**Figure 18 - Products Advertised in 2006**



**Figure 19 – Yurman Products**

