**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

ANDIN INTERNATIONAL, INC.                          :          Civil Action No. 08 cv 1159 (HB)

                Plaintiff,                              :

      - against -                                     :

YURMAN STUDIO, INC.                                    :

              Defendant.                            :

                                            :

------------------------------------------------------- x

                                            :

YURMAN STUDIO, INC.                                    :

              Defendant-                           :
              Counterclaimant,            :

      - against -                                     :

ANDIN INTERNATIONAL, INC. and          :
VARDI GEM LUSTRE, LLC                          :

              Counterclaim-                     :
              Crossclaim Defendants.     :

                                            :

------------------------------------------------------- x

## DECLARATION OF DAVID YURMAN

       I, David Yurman, pursuant to 28 U.S.C. § 1746, hereby declare the following under penalty of perjury:

       1.       I am the founder and Chairman of the Board of Yurman Studio, Inc. ("Yurman"). I am also the principal jewelry designer for Yurman. I make this declaration in opposition to the motion of Andin International Inc. ("Andin") for Summary Judgment. I have personal knowledge of the facts set forth below.

2.      I began my professional career in design in the 1960's as a sculptor, apprenticing during this period with acclaimed sculptors Jacques Lipchitz and Theodore Rozak. I have also been designing jewelry since I was in high school.

3.      My wife Sybil and I founded Yurman in 1980. Our whole concept in forming the company was to do something that was not being done in the United States jewelry industry: to create jewelry designs on the cutting edge, using my background as an artist to take design elements that were common to the jewelry industry and use them in fresh and new combinations. I wanted our products to be known not only for their quality and workmanship, but also for their freshness and aesthetic value.

4.      From the inception, our company has set new standards for designing and marketing jewelry, infusing the disciplines of art and fashion into the jewelry making process. Yurman has become a world renowned supplier of fine jewelry sold under the DAVID YURMAN brand name. Indeed, Yurman has established a distinctive brand image akin to the branding paradigm of the clothing and fashion industry. While many jewelry makers are known for the quality of their products, I have succeeded in what I set out to do: Yurman also is recognized for the distinctiveness of its designs.

5.      Since its founding in 1980, Yurman has achieved remarkable success. Over the last 28 years, Yurman and its authorized retailers have experienced double digit growth in the sale of Yurman products. Typically, Yurman ranks as the top selling brand in overall sales among authorized retailers.

6.      Since the 1980's, I have received numerous awards in recognition of my jewelry designs including the prestigious Cultured Pearl Designer of the Year Award and the InterGold Design Award.

7.      Artistic inspiration and original and distinctive jewelry designs remain at the core of my approach to product development and design and, in my opinion, are the essential ingredients of Yurman's remarkable success.

**My Creation Of Jewelry Designs**

8.      I am constantly creating new jewelry designs. Like any company in the fashion business, Yurman launches new designs and collections four or five times a year, so I am consumed with creating fresh, new material. While I draw inspiration from various locations and themes that are often carried through a series of designs and result in a "collection" of items, each item I create, and every aspect of each item, is my own unique design.

9.      My design process begins with sketches. I am constantly sketching out new designs, often as any artist would, usually on artist's paper, but sometimes on hotel stationery or the back of a napkin. Once I have completed a preliminary sketch of a new design, I work with illustrators, who under my direction create an illustrative drawing or CAD drawing. A CAD drawing is essentially a computer schematic that shows the exact size, scale, and proportion of each element in the design. Each item is sketched and re-sketched until I think the relative proportions and the overall design, at least on paper, is satisfactory. Sometimes I will have the illustrators re-sketch a single item multiple times, changing the size, scale, and/or proportion of the various components of the item.

10.     It is only after I have created a sketch with the correct combination of elements that interact with each other from the standpoint of size, scale and proportion, that the product development process advances to the next stage. I design all of the components that make up a particular item of jewelry. There rarely is a "stock" item

used in any design. Even what I refer to as my "signature" components, such as the cable motif, will vary from item to item in size, scale and proportion.

11.     The next step in the process is to create a working model of the piece. This involves making hand samples of the design or of the individual components that make up the new design, to the proportions in which they appear in the the illustration. These resulting wax models are reviewed by me to ensure that they correctly mimic my intended scale and proportions. Sometimes these waxes may be re-carved or re-grown multiple times until I am satisfied with them. If we created individual components, they are then "pieced together" to see how each component relates to every other component from the standpoint of scale, proportion, color combination, and overall appearance.

12.     Rarely is the transition from sketch to sample completed in one shot. Typically, after I see a model, I make a range of additional artistic changes which can include alterations in the design of a particular component, as well as changes in size, spacing and proportions of the components as they relate to each other.

13.     Only when I am completely satisfied with not only the unique design of each component or element of a new jewelry design, but also how the components work together to make an overall design that is new, fresh and distinct, do I release an item for production. The fact that a new design may have certain thematic similarities to other previously designed Yurman items, and may be part of the same "collection," does not take away from the fact that each design goes through a process where literally dozens of artistic and creative choices are made, resulting in a new and distinct item every time.

14.     As I describe more fully below, this is exactly the process I followed in creating the designs that I seek to protect in this case.

**Yurman's Valuable Intellectual Property**

15.    Among Yurman's most important assets is the intellectual property associated with the DAVID YURMAN brand and the jewelry designs for which Yurman has become famous. Specifically, Yurman is the owner of the unique and distinctive trade dress of its jewelry designs as well as numerous U.S. copyright registrations covering many of its unique and innovative jewelry designs.

16.    Over the years, Yurman has regularly registered copyrights in its unique and innovative jewelry designs with the United States Copyright Office. Currently, Yurman owns 113 United States copyright registrations covering its individual jewelry designs and collections of jewelry designs.

17.    In addition, Yurman diligently enforces its intellectual property rights by investigating instances of infringement, notifying individuals and entities who have infringed Yurman's intellectual property rights and filing suit against such individuals and entities where necessary to protect Yurman's rights.

**The Original Designs At Issue In This Case**

18.    In 1997, I created a pave enhancer (Yurman Item No. D06384), which Yurman has registered with the United States Copyright Office, as well as another enhancer (D06390) and earring (E06305). As discussed below, these items all have the same unique combination of design features -- a cushion-shaped focal point made of pave diamonds, framed by a rim of gold, which in turn is framed by cable, or twisted wire, in sterling silver.

19.    These items are part of Yurman's Silver Ice Collection, which was launched in 1997. The common thematic characteristic of items that are part of the Silver

- 5 -

Ice Collection is the use of diamonds and silver. Previously, it was traditional for diamonds to be used only in combination with gold or platinum. Combining diamonds and silver was not seen in the fine jewelry industry, because silver was typically not considered to be precious enough to combine with diamonds. My approach in designing jewelry, however, has always been to make fine jewelry that is fun and "individual," that is, jewelry that is casual enough for a woman to wear to work during the day, and yet dressy enough for her to wear out at night. That was the thinking behind the Silver Ice Collection.

20.    I decided to seek copyright protection for the pave enhancer (D06384), the first of the above three items, because the design contained a unique combination of design elements that I had never seen before. Specifically, I started with a center or focal point consisting of a field of pave diamonds in a rectangular shape with rounded corners -- what we at Yurman call a "cushion" design, -- which I encircled with a smooth band of yellow gold to provide the appearance of a platform for the pave diamonds, and which I then encircled with an outside trim of cable, or twisted wire, in sterling silver. The other enhancer (D06390), which is simply a larger version of (D06384) and earring (E06305), both described in paragraph 18 above, also incorporate this same unique combination of design elements. Photographs of the two enhancers (D06384 and D06390) and the earring (E06305) are attached as Exhibit 1.

21.    At first, these designs, and the Silver Ice Collection in general, were met with resistance from retailers. As I explained above, at the time, no one in the jewelry industry was pairing silver with diamonds. However, I believed in the distinctiveness and marketability of the Silver Ice Collection, and it became a huge success. Part of that

success was due to the fact that the Silver Ice Collection, including the items shown in Exhibit 1, was heavily promoted during the launch year, and for a couple of years after that. The promotion of these items is described more fully in the accompanying Declaration of Janet Hayward.

22.     Because of the enormous popularity of the Silver Ice Collection, including the enhancers and earring shown in Exhibit 1, I continued to add to the collection. Among other Silver Ice items, in 2001, I designed another earring (E06597), which is simply a smaller version of E06305 and, in 2004, I designed a ring (R07000) both of which incorporate the same unique combination of design elements. Photographs of these two items are attached as Exhibit 2. Together with the three items seen in Exhibit 1, these five items are the items that most closely match up to the knockoffs being sold by the plaintiff Andin in this case. In addition, over the years, I have designed at least seven other items that incorporate the same unique combination of design elements. Photographs of the additional seven items are attached as Exhibit 3.

23.     The five original pieces at issue in this case have been a significant part of the success of the Silver Ice Collection. They were extremely popular when they were first launched in 1997 and they continue to sell today.

24.     I have reviewed the papers submitted by Andin in support of its summary judgment motion, and in particular the Declaration of Ofer Azrielant and the Declaration of Ramona Azulay. In their declarations, Mr. Azrielant and Ms. Azulay assert that the design elements used in the Yurman products "rounded stones . . . as the central focal point of a piece of jewelry," "gold framing of a central stone -- including pave diamond cushions," and "cable jewelry" existed long before I created my designs. This, however,

misses the point. I do not claim, nor have I ever claimed, that I created these individual design elements, although I have refined them according to my own sensibilities. It is, however, my unique combination of these design elements that has resulted in an overall look that is new, fresh, and distinct from anything previously available in the jewelry market.

25.     Notably absent from Mr. Azrielant's and Ms. Azulay's declarations is any claim that my unique **combination** of design elements ever existed before I created my designs. In addition, I have reviewed the exhibits of prior jewelry art attached to Mr. Azrielant's declaration, and note that none of the jewelry items depicted in those exhibits contains the combination of elements that appear in my designs. That is because, as I have said, this combination of elements is unique to jewelry design.

26.     Andin also suggests in its papers that I have not described with sufficient particularity the individual design elements in the Yurman designs that Andin has knocked off. In particular, Andin attacks my purported inability to describe what Yurman has referred to as Yurman's "signature cable."

27.     First, again, it is important to point out that I am not claiming any exclusive rights to the use of cable as a design element in jewelry. While Yurman is clearly known for its unique and innovative use of cable as a design element, I did not invent cable -- in general, cable is a design element that has existed in jewelry history. Rather, what Yurman seeks to protect is the unique combination of elements which makes these designs recognizable as David Yurman designs -- in the case of these designs, a pave cushion, which is the focal point of the design, surrounded by gold, surrounded by silver cable.

- 8 -

28.    Second, the way I was questioned at my deposition, and asked to describe the features of my "signature cable," was totally misleading, and irrelevant to this discussion. As I said at my deposition, there is no single cable element that I use over and over again in my designs -- that would be impossible given the physical limitations presented by each individual jewelry item. Rather, when I refer to "signature cable," what I mean is the unique way I use cable to interact with the rest of my design. My "signature," if you will, is my use of cable as a design element in combination with other elements, not the use of any one particular type of cable. In any event, I repeat -- cable is just one of several elements that make up the trade dress Yurman is seeking to protect in this case. That trade dress is described very particularly in paragraph 20 above, and in Yurman's court pleadings in this case and involve the interaction of numerous design elements, not just cable.

29.    The particularity with which Yurman has described its trade dress in this case was amply demonstrated at my deposition when counsel for Andin showed me numerous pictures of third party jewelry items and asked me whether those items infringed on our trade dress. Applying the precise description of the trade dress set forth in paragraph 20 above and in our court pleadings, I was able to tell immediately which items I thought infringed on Yurman's trade dress and which did not. I note that one of the pictures he showed me that I identified as infringing on Yurman's trade dress was the so-called "Vardi" ring that Mr. Azrielant admits Andin copied in its knockoff ring, pendant, and earring ensemble.

30.    To the extent that Andin claims that Yurman does not have exclusive use of its trade dress because third parties have been using it concurrently, may I remind the

Court that I designed the original items that incorporate the Yurman trade dress in 1997. As far as I know, and I have seen no evidence to the contrary, Yurman has exclusively sold items containing this trade dress for nearly ten years. The third party items that were shown to me at my deposition and which I identified as infringing are knockoffs of my well known popular designs that did not surface until 2006. Indeed, I have now asked my counsel to investigate these third party products and take action against their proprietors.

### Andin's Infringing Conduct

31.    Recently, Yurman became aware that Andin has been manufacturing and selling a ring, pendant, and earring ensemble that copies the unique combination of design elements in Yurman's copyrighted enhancer design, and which mimic the Yurman trade dress used in no less than twelve items. I first saw the Andin items when I was shown an advertisement from a December 3, 2007 issue of *People Magazine* depicting pendant, earring, and ring designs being sold by Sam's Club. I could not believe my eyes. The ring, pendant, and earring items shown in that advertisement incorporate the exact combination of design elements that I have been using in my highly successful enhancers, earrings, and rings for over ten years. I have no doubt that the use of these design elements was deliberate and intended to emulate our well-known Yurman "look" and trade dress. A copy of the *People Magazine* advertisement showing the infringing items is attached as Exhibit 4.

32.    In his declaration, Mr. Azrielant claims that he had a conversation with me, after we learned that Andin was the supplier of these goods to Sam's Club, in which I told him that I "did not have an issue with the Andin Ring and stated that the Andin Ring had been included in the cease and desist letters because of an error by Yurman's in-

house counsel." Azrielant Decl. ¶ 27. I never made that statement. I have always

believed that the Andin ring is an infringement, as it is, in my view, substantially similar

in overall appearance to the copyrighted Yurman enhancer (D06384), and also

confusingly similar to the well-known Yurman trade dress that has been incorporated in

at least twelve highly successful Yurman jewelry items. As the Court will note, however,

the Sam's Club advertisement that appeared in *People Magazine* also depicted a bracelet

item. I did tell Mr. Azrielant that I did not believe that the bracelet, which is, apparently,

another Andin product, was an infringement. However, I never suggested that the Andin

ring was not an infringement -- on the contrary, I did and still do believe that it clearly

and deliberately is.

### Yurman's Copyright Claim

33.     A simple comparison of the copyrighted enhancer D06384 and each of the

items in the ensemble manufactured and offered for sale by Andin demonstrate the

substantial similarity of those items to the enhancer, from the standpoint of their

combination of design elements. The Andin pieces appropriate the total concept and

aesthetic intent of Yurman's copyrighted design.

34.     For example, when you look at the Andin pendant, you see a cushion-

shaped focal point, which is in pave diamonds, surrounded or framed by a rim of gold,

which in turn is surrounded or framed by cable. As shown by the comparison, attached

as Exhibit 5, the Andin pendant consists of the same combination of elements in the same

general arrangement, proportion, and shape as the copyrighted Yurman enhancer,

interacting with each other in exactly the same way. That the cushions in the two pieces

may be slightly different sizes, or that the twist in the cable may vary slightly from the

Andin piece to the Yurman copyrighted enhancer, does not change the overall concept and feel of the pieces, which is identical to my aesthetic intent as the designer.

35.    I understand that Andin suggests that the differences between the pieces are highlighted if one looks at the items from the side or rear views, because, for example, the side view of the Andin pendant shows three rows of cable while the Yurman enhancer has only one row of cable. But that is not the way one looks at a piece of jewelry. It is the look and feel of the combination of elements taken as a whole that gives a piece of jewelry its unique and recognizable qualities. When you look at these pieces of jewelry from the front or top view, you see the same combination of design elements interacting with each other in exactly the same way. Indeed, if you look at the front or top view of the Andin pendant, which is how a consumer usually views a pendant, you see only one row of cable, just like what you see in the front or top view of the Yurman enhancer.

36.    Thus, although the Andin pendant does not replicate the Yurman copyrighted enhancer millimeter for millimeter, it uses the same distinct combination of design elements that appear in the copyrighted Yurman enhancer, in the same manner, to give the Andin pendant the same aesthetic appeal. There is no doubt in my mind that the Andin pendant appropriates the total concept and feel of the Yurman copyrighted design.

37.    A simple comparison of the Andin earring to the Yurman copyrighted enhancer, similarly demonstrates the striking similarity between that piece and Yurman's copyrighted enhancer. Like the Andin pendant, the Andin earring uses the same combination of key design elements that give the Yurman piece its aesthetic appeal, interacting with each other in the same way. The fact that one item is an enhancer and

the other is an earring does not matter -- both items have the identical combination of design elements and the same aesthetic intent. A comparison of the Andin earring and the Yurman copyrighted enhancer is attached as Exhibit 6.

38.    Similarly, the Andin ring uses the same combination of key design elements that give the Yurman piece its aesthetic appeal, interacting with each other in the same way. A comparison of the Andin ring and the Yurman copyrighted enhancer is attached as Exhibit 7.

**Yurman's Trade Dress Claims**

39.    In addition to infringing the key combination of elements in the Yurman copyrighted enhancer, from the standpoint of trade dress or overall "look," each of the items in the Andin ensemble are also confusingly similar to their counterpart piece(s) in the Yurman collection. Indeed, the resemblance of the Andin pieces to the Yurman pieces becomes even more striking when you look at each item next to its counterpart.

40.    The Andin pendant has the same combination of elements in the same arrangement, proportion, and shape as the Yurman enhancer or pendant. A comparison of the Andin pendant and the corresponding Yurman enhancer is attached as Exhibit 8.

41.    The Andin earring has the same combination of elements in the same arrangement, proportion, and shape as the Yurman earring. A comparison of the Andin earring and the corresponding Yurman earring is attached as Exhibit 9.

· 42.    And the Andin ring, has the same combination of elements in the same arrangement, proportion, and shape as the Yurman ring. A comparison of the Andin ring and the corresponding Yurman ring is attached as Exhibit 10.

43.     The items in the Andin ensemble have the same general arrangement, proportion and shape as the Yurman trade dress.  It is this combination of elements that has come over many years to be known as a Yurman look and that cause the consumer not only to think that they are attractive jewelry pieces (as evidenced by the remarkable sales) but also as jewelry designs that are distinctively "Yurman."

Declared under penalty of perjury, this 27 day of June, 2008.

_____
David Yurman

# EXHIBIT 1

YURMAN ENHANCER (D06384)



YURMAN ENHANCER (D06390)



YURMAN EARRING (E06305)



# EXHIBIT 2

**YURMAN EARRING (E06597)**



YURMAN RING (R07000)



# EXHIBIT 3

YURMAN ENHANCER (D06698)



**YURMAN ENHANCER (D06999)**



YURMAN BRACELET (B06999)



YURMAN RING (R06999)



YURMAN ENHANCER (D06741)



YURMAN RING (R06740)



YURMAN EARRING (E06741)

 

**EXHIBIT 4**



**The tree is decorated,
now it's your turn.**

.23 ct. t.w. Diamond Pave Sterling Silver Earrings
with 14k Yellow Gold Accent - $161.88

.23 ct. t.w. Diamond Pave Sterling Silver Pendant
with 14k Yellow Gold Accent - $146.82

.23 ct. t.w. Diamond Pave Sterling Silver Ring
with 14k Yellow Gold Accent - $149.88

.18 ct. t.w. Diamond Pave Sterling Silver Bangle
with 14k Yellow Gold Accent - $152.78



ccepted at Sam's Club®

**enjoy the possibilities** 

# EXHIBIT 5

# COPYRIGHT COMPARISON

### YURMAN COPYRIGHTED
### ENHANCER (D06384)

### ANDIN PENDANT



Common Design Features

Cushion-shaped focal point
consisting of pave diamonds

Surrounded or framed by
rim of gold

Surrounded or framed by cable or
twisted wire in sterling silver

# EXHIBIT 6

# COPYRIGHT COMPARISON

YURMAN COPYRIGHTED
ENHANCER (D06384)

ANDIN EARRING



Common Design Features

Cushion-shaped focal point
consisting of pave diamonds

Surrounded or framed by
rim of gold

Surrounded or framed by cable or
twisted wire in sterling silver

# EXHIBIT 7

# COPYRIGHT COMPARISON

**YURMAN COPYRIGHTED
ENHANCER (D06384)**

**ANDIN RING**



Common Design Features

Cushion-shaped focal point
consisting of pave diamonds

Surrounded or framed by
rim of gold

Surrounded or framed by cable or
twisted wire in sterling silver

# EXHIBIT 8

# TRADE DRESS COMPARISON

**YURMAN ORIGINAL
ENHANCER (D06384)**

**ANDIN PENDANT**



<u>Trade Dress Elements</u>

A center or focal point consisting of a
field of pave diamonds in a rectangular
shape with rounded corners –
an elongated "cushion" design

A smooth band of yellow gold providing
the appearance of a platform for the
pave diamonds

An outside trim of Yurman's signature
cable design, or twisted wire,
in sterling silver

# TRADE DRESS COMPARISON

### YURMAN ORIGINAL
### ENHANCER (D06390)

### ANDIN PENDANT



Trade Dress Elements

A center or focal point consisting of a
field of pave diamonds in a rectangular
shape with rounded corners –
an elongated "cushion" design

A smooth band of yellow gold providing
the appearance of a platform for the
pave diamonds

An outside trim of Yurman's signature
cable design, or twisted wire,
in sterling silver



# EXHIBIT 9

# TRADE DRESS COMPARISON

**YURMAN'S ORIGINAL
EARRING (E06305)**

**ANDIN EARRING**

Trade Dress Elements

A center or focal point consisting of a
field of pave diamonds in a rectangular
shape with rounded corners –
an elongated "cushion" design

A smooth band of yellow gold providing
the appearance of a platform for the
pave diamonds

An outside trim of Yurman's signature
cable design, or twisted wire,
in sterling silver



# TRADE DRESS COMPARISON

**YURMAN ORIGINAL**
**EARRING (E06597)**

**ANDIN EARRING**

<u>Trade Dress Elements</u>

A center or focal point consisting of a
field of pave diamonds in a rectangular
shape with rounded corners –
an elongated "cushion" design

A smooth band of yellow gold providing
the appearance of a platform for the
pave diamonds

An outside trim of Yurman's signature
cable design, or twisted wire,
in sterling silver





# EXHIBIT 10

# TRADE DRESS COMPARISON

**YURMAN ORIGINAL
RING (R07000)**

**ANDIN RING**

<u>Trade Dress Elements</u>



A center or focal point consisting of a
field of pave diamonds in a rectangular
shape with rounded corners –
an elongated "cushion" design

A smooth band of yellow gold providing
the appearance of a platform for the
pave diamonds

An outside trim of Yurman's signature
cable design, or twisted wire,
in sterling silver

