Louis S. Ederer
(louis.ederer@aporter.com)
Marla Eisland Sprie
(marla.eisland.sprie@aporter.com)
John Maltbie
(john.maltbie@aporter.com)
Arnold & Porter LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Defendant-Counterclaimant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x

ANDIN INTERNATIONAL, INC.

                       Plaintiff,

           - against -

YURMAN STUDIO, INC.

                   Defendant.

------------------------------------------------------ x

YURMAN STUDIO, INC.

              Defendant-
              Counterclaimant,

           - against -

ANDIN INTERNATIONAL, INC. and
VARDI GEM LUSTRE, LLC

             Counterclaim-
             Crossclaim Defendants.

------------------------------------------------------ x

Civil Action No. 08 cv 1159

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

ARGUMENT .......................................................................................................................... 4

I.    SUMMARY JUDGMENT ON YURMAN'S COPYRIGHT INFRINGEMENT
      CLAIM SHOULD BE DENIED ................................................................................. 4

      A.    Andin and Vardi Had Access to the Yurman Copyrighted Enhancer and
            Did Not Independently Create the Infringing Jewelry Designs .......................... 6

      B.    Andin's Infringing Jewelry Designs are Substantially Similar to the
            Yurman Copyrighted Enhancer .......................................................................... 8

            1.    It is the Combination of Design Elements, Not the Individual
                  Elements, that Is Determinative ............................................................... 9

            2.    This Court Should Analyze Substantial Similarity Under the
                  Ordinary Observer Test ........................................................................... 10

      C.    The Andin Ensemble is Substantially Similar to the Yurman Copyrighted
            Enhancer .......................................................................................................... 11

II.   SUMMARY JUDGMENT ON YURMAN'S TRADE DRESS CLAIMS
      SHOULD BE DENIED ........................................................................................... 12

      A.    Yurman Has Sufficiently Articulated its Trade Dress .................................... 13

      B.    The Yurman Trade Dress Has Achieved Secondary Meaning .......................... 14

            1.    Yurman's Advertising Expenditures for the Yurman Trade Dress
                  Supports a Finding of Secondary Meaning ............................................. 15

            2.    Unsolicited Media Coverage of the Yurman Trade Dress Items
                  Supports a Finding of Secondary Meaning ............................................. 16

            3.    Sales Success of the Yurman Trade Dress Supports a Finding of
                  Secondary Meaning ................................................................................ 16

            4.    Attempts to Plagiarize Yurman's Trade Dress Supports a Finding
                  of Secondary Meaning ............................................................................ 16

# TABLE OF CONTENTS

**PAGE**

5.  Length and Exclusivity of Yurman's Use of the Yurman Trade
    Dress Supports a Finding of Secondary Meaning.................................... 17

C.  Yurman Has Made a Threshold Showing of Likelihood of Confusion .............. 18

1.  Strength of the Yurman Trade Dress Supports Likelihood of
    Confusion................................................................................ 18

2.  Similarity of the Yurman Trade Dress and the Andin Ensemble
    Supports Likelihood of Confusion............................................ 19

3.  Proximity of the Products and Bridging the Gap Supports
    Likelihood of Confusion ......................................................... 20

4.  Andin's Bad Faith Supports Likelihood of Confusion ........................... 21

5.  The Quality of the Andin Ensemble Supports Likelihood of
    Confusion................................................................................ 22

6.  The Sophistication of Consumers Supports Likelihood of
    Confusion................................................................................ 22

7.  Actual Confusion Supports a Finding of Likelihood of Confusion ......... 23

8.  The Types of Confusion at Play Need to Be Resolved by a Jury ............ 23

D.  Proof of Willfulness Is Not Needed for An Accounting of Andin's Profits........ 25

CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

<u>PAGE(S)</u>

**CASES**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.,*
   722 F.2d 988 (2d Cir.1983)...............................................................................7

*Axelrod & Cherveny Architects, P.C. v. Winmar Homes,*
   No. 2:05 711 ENV ETB,
   2007 WL 708798 (E.D.N.Y. Mar. 6, 2007).................................................5, 6, 8

*Bambu Sales, Inc. v. Ozark Trading Inc.,*
   58 F.3d 849 (2d Cir. 1995).............................................................................21

*Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,*
   90 F. Supp. 2d 431 (S.D.N.Y. 2000)...............................................................21

*Boisson v. Banian, Ltd.,*
   273 F.3d 262 (2d Cir. 2001)...........................................................................10

*Boone v. Jackson,*
   206 Fed. Appx. 30 (2d Cir. 2006)...................................................................10

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,*
   973 F.2d 1033 (2d Cir. 1992).........................................................................15

*Cadbury Beverages, Inc. v. Cott Corp.,*
   73 F.3d 474 (2d Cir. 1996)..........................................................13, 18, 21, 22

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,*
   348 F. Supp. 2d 217 (S.D.N.Y. 2004).......................................................16, 22

*Cartier, Inc. v. Samo's Sons, Inc.,*
   No. 04 Civ. 2268 RMB DFE,
   2005 WL. 2560382 (S.D.N.Y. Oct. 11, 2005).................................................19

*Cartier, Inc. v. Symbolix, Inc.,*
   454 F. Supp. 2d 175 (S.D.N.Y. 2006).............................................................24

*Cartier, Inc. v. Aaron Faber, Inc.,*
   512 F. Supp. 2d 165 (S.D.N.Y. 2007).............................................................25

*Coach, Inc. v. We Care Trading Co.,*
   67 Fed. Appx. 626 (2d Cir. 2002),
   *cert. denied,* 537 U.S. 1108 (2003)...............................................................14

# TABLE OF AUTHORITIES

**PAGE(S)**

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
    933 F.2d 163 (2d Cir. 1991)............................................................................13, 15

*Dan River, Inc. v. Sanders Sale Enterprises, Inc.*,
    97 F. Supp. 2d 426 (S.D.N.Y. 2000)..................................................................5

*Deere & Co. v. MTD Holdings Inc.*,
    No. 00 Civ 5936, 2004 WL 324890 (S.D.N.Y. Feb. 19, 2004) ............................19, 20

*E-Z Bowz, LLC v. Professional Prod. Research Co.*,
    No. 00 Civ. 8670,
    2003 U.S. Dist. LEXIS 15364 (S.D.N.Y. Sept. 5, 2003)..................................15

*eScholar, LLC v. Otis Educational  Sytems, Inc.*,
    No. 04 Civ. 4051, 2005 WL 2977569 (S.D.N.Y. Nov. 3, 2005) ..................................5

*Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*,
    No. 7:02-cv-0517, 2005 WL 1173562 (N.D.N.Y. May 11, 2005) ............................13

*Fun-Damental Too, Ltd. v. Gemmy Industrial Corp.*,
    111 F.3d 993 (2d Cir. 1997)............................................................................18

*GTFM, Inc. v. Solid Clothing, Inc.*,
    215 F. Supp. 2d 273 (S.D.N.Y. 2002)..................................................................21

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988)............................................................................7

*Gross v. Bare Escentuals Beauty, Inc.*,
    No. 03 Civ 3089, 2008 WL 2332307 (S.D.N.Y. June 4, 2008)..................................15

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993)............................................................................19

*Gucci America, Inc. v. Action Activewear, Inc.*,
    759 F. Supp. 1060 (S.D.N.Y. 1991)..................................................................22

*Jeffrey Milstein, Inc. v. Gerger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995)..................................................................................13

# TABLE OF AUTHORITIES

**PAGE(S)**

*Johnson & Johnson Consumer Companies v. Aini,*
540 F. Supp. 2d 374 (E.D.N.Y. 2008) ........................................................21

*Johnson & Johnson v. Actavis Group hf,*
No. 06 Civ. 8209, 2008 WL 228061 (S.D.N.Y. Jan. 25, 2008)..................15

*Jorgensen v. Epic/Sony Records,*
351 F.3d 46 (2d Cir. 2003), *aff'd after remand,*
157 Fed. Appx (2d Cir. 2003),
*cert. denied,* 547 U.S. 1154 (2004) ...........................................................5

*Knitwaves, Inc. v. Lollytogs Ltd.,*
71 F.3d 996 (2d Cir. 1995)....................................................6, 10,11, 12

*Lexington Management Corp. v. Lexington Capital Partners,*
10 F. Supp. 2d 271 (S.D.N.Y. 1998).......................................................19

*Lipton v. Nature Co.,*
71 F.3d 464 (2d Cir. 1995)................................................5, 6, 7, 8

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
799 F.2d 867 (2d Cir. 1986)..........................................22, 23, 24, 25

*M. Lady, LLC v. AJI, Inc.,*
No. 06 Civ. 0194,
2007 WL 2728711 (S.D.N.Y. Sept. 19, 2007).........................5, 10, 11

*Mattel, Inc. v. Goldberger Doll Manufacturing Co.,*
365 F.3d 133 (2d Cir. 2004)........................................................7

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
818 F.2d 254 (2d Cir. 1987).......................................................24

*New Colt Holding Corp. v. RJG Holdings of Florida, Inc.,*
312 F. Supp. 2d 195 (D. Conn. 2004).......................................15, 16, 23

*Nike, Inc. v. Top Brand Co.,*
No. 00 Civ. 8179, 2005 WL 1654859 (S.D.N.Y. July 13, 2005) ...............25

*Nikon, Inc. v. Ikon Corp.,*
803 F. Supp. 910 (S.D.N.Y. 1992) ..........................................................20

# TABLE OF AUTHORITIES

PAGE(S)

*Nora Beverages, Inc. v. Perrier Group of America, Inc.*,
    269 F.3d 114 (2d Cir. 2001).....................................................................13

*Odegard, Inc. v. Costikyan Classic Carpets, Inc.*,
    963 F. Supp. 1328 (S.D.N.Y.1997)..........................................................7

*Orb Factory, Ltd. v. Design Science Toys, Ltd.*,
    No. 96 Civ. 9469, 1999 WL 191527 (S.D.N.Y. April 7, 1999)................21

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
    317 F.3d 209 (2d Cir. 2003)......................................................................18

*Perfect Fit Industrial v. Acme Quilting Co.*,
    618 F.2d 950 (2d Cir. 1980), *cert. denied*, 459 U.S. 832 (1982)...................19

*Peter Pan Fabrics Inc. v. Martin Weiner Co.*,
    274 F.2d 487 (2d Cir. 1960)......................................................................10

*Polaroid Corp. v. Polarad Electrics Corp.*,
    287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820 (1961)....................18, 22

*Queenie, Ltd. v. Nygard International*,
    204 F. Supp. 2d 601 (S.D.N.Y. 2002).........................................................8

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005)................23

*The Sports Authority, Inc. v. Prime Hospitality Corp.*,
    89 F.3d 955 (2d Cir. 1996).......................................................................18

*Tienshan, Inc. v. C.C.A. International*,
    895 F. Supp. 651 (S.D.N.Y. 1995) ..........................................................12

*Tri-Star Pictures, Inc. v. Unger*,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998).........................................................17

*U-Neek, Inc. v. Wal-Mart Stores, Inc.*,
    147 F. Supp. 2d 158 (S.D.N.Y. 2001).......................................................17

*Wal-Mart Stores, Inc. v. Samara Brothers*,
    529 U.S. 205 (2000)............................................................................18, 19

## TABLE OF AUTHORITIES

<u>**PAGE(S)**</u>

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir.), *cert denied,* 476 U.S. 1159 (1986)............................................6

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996)..................................................................................5, 11

*Yurman Design, Inc. v. Golden Treasure Imports, Inc.,*
    275 F. Supp. 2d 506 (S.D.N.Y. 2003)................................................................6, 9, 11

*Yurman Design, Inc. v. PAJ, Inc.,*
    93 F. Supp. 2d 449 (S.D.N.Y. 2000),
    *aff'd in part, rev'd in part on other grounds,*
    262 F.3d 101 (2d Cir. 2001)......................................................................................9

*Yurman Design, Inc. v. PAJ, Inc.,*
    262 F.3d 101 (2d Cir. 2001)..............................................................4, 9, 11, 13, 14

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 1125...................................................................................................12

17 U.S.C. § 102(a) .................................................................................................4

4 M. Nimmer & D. Nimmer,
    *Nimmer on Copyright,* § 13.08 (2007).........................................................................6

## PRELIMINARY STATEMENT

Contrary to Andin International, Inc. ("Andin")'s attempt to assume the role of David in a battle against Goliath, this case is more like *Goliath v. The Incredible Hulk*. Andin, a major player in the jewelry industry, just as large and at least as sophisticated in the area of intellectual property protection as defendant Yurman Studio, Inc. ("Yurman"); who runs the largest website in the jewelry industry, www.jewelry.com; and who holds 1500 copyright registrations (to Yurman's 113), is defending its blatant copying of Yurman's popular, copyrighted pendant design (the "Yurman Copyrighted Enhancer"), as well as the trade dress embodied in the Yurman Copyrighted Enhancer and eleven other Yurman earring, pendant and ring designs (together the "Yurman Trade Dress Items"), with "incredible" explanations.

Yurman seeks to enforce its registered copyright in the unique combination of design elements found in the Yurman Copyrighted Enhancer and in the eleven other Yurman Trade Dress Items, namely, a center consisting of pave diamonds in a "cushion" shape; surrounded by a smooth band of yellow gold; and wrapped in a trim of cable, or twisted wire, in sterling silver (the "Yurman Trade Dress"). This unique combination of design elements has been faithfully duplicated by Andin in a pendant, a pair of earrings, and a ring (the "Andin Ensemble").

Andin's story, in response to Yurman's copyright claim, is that there cannot be copyright infringement because "we didn't copy Yurman, we copied Vardi." Vardi is Moshe Vardi, principal of counterclaim-defendant Vardi Gem Lustre, LLC ("Vardi Gem"), who although in contact with Andin's (now disqualified) counsel George Gottlieb after Andin filed this suit, first avoided service of a third party subpoena and then defaulted when added as a crossclaim defendant. This is not surprising, since Vardi's ring, which was the admitted "inspiration" for the Andin Ensemble, and by Andin's president, Ofer Azrielant's, own admission, is a direct knockoff of a ring that Yurman had in its line for years, and also pilfers the combination of

1

design elements in the Yurman Copyrighted Enhancer. As a matter of law, Andin's argument provides absolutely no defense to a claim for copyright infringement.

Andin's other argument in response to Yurman's copyright claims, is that all the individual design elements used in the Yurman Copyrighted Enhancer are elements previously found in jewelry history, and, therefore, Yurman's copyright is unenforceable. This argument fails because in jewelry design, as in many other creative media, copyright does not protect the individual design elements, but rather the manner in which those elements are used in combination. It is the designer's aesthetic intent and creativity in combining previously used design elements in new ways that make a jewelry design copyrightable. Accordingly, Andin's parsing of the design elements of the Yurman Copyrighted Enhancer is not supported by the law.

On its trade dress claims, Yurman has proffered a mountain of evidence showing that over the last ten years, it has introduced a series of highly distinctive jewelry items sharing the Yurman Trade Dress; it has engaged in significant advertising and promotion of these items; that these items have met with substantial sales success; and that the Yurman Trade Dress has come to signify to consumers that Yurman is the source of these items. Further, Yurman has demonstrated that each of the items in the Andin Ensemble matches up almost identically to a corresponding Yurman Trade Dress Item that Yurman has sold successfully for years.

In response, although clearly Andin and its designers know exactly who David Yurman is, and the designs Yurman is known for, Andin essentially argues that like the proverbial three monkeys, they "saw no evil, heard no evil and spoke no evil." Somehow it never occurred to Azrielant, who knows Mr. David Yurman personally, and Andin's chief designer Ramona Azulay, who knows everything about jewelry history and design except the work of David Yurman, the best-known jewelry designer of his time, that the designs they were selling to three

2

large U.S. retailers, Sam's Club, an affiliate of Wal-Mart, J.C. Penney and Finlay's, copied a hugely popular David Yurman look. Andin also forgets that, before it ever sold the Andin Ensemble to Sam's Club and J.C. Penney, a Finlay's buyer refused to buy a ring from the Andin Ensemble unless Andin modified the design, because it looked too much like Yurman. It also slips Andin's mind that when this dispute was brought to the attention of Beryl Raff, the chief jewelry buyer for J.C. Penney, she told Andin that had she focused on the Andin Ensemble, J.C. Penney would not have purchased them, because they looked too much like Yurman.

Instead of admitting the obvious, Andin tries to run away from Yurman's trade dress claims, unintelligibly arguing that Yurman has not sufficiently articulated its trade dress because at his deposition, Mr. Yurman could not describe one of the many design elements that makes up the Yurman Trade Dress — Yurman's "signature" cable element. As Mr. Yurman explains, however, he never said, and the company has never maintained, that there is only one Yurman signature cable. Instead, as Mr. Yurman explains, what makes cable his "signature" is the way he uses it with other key design elements, as he did here with the Yurman Trade Dress Items.

With nowhere to go, Andin is left to argue that Yurman's trade dress infringement claims fail because Yurman has not shown secondary meaning — essentially claiming that because Yurman is not promoting and selling the Yurman Trade Dress Items today, and because third parties are knocking off the Yurman Trade Dress, no jury could find that Yurman has developed secondary meaning. Andin ignores the evidence that from 1997 to 2005, Yurman exclusively sold the Yurman Trade Dress Items; heavily promoted them; spent millions of dollars advertising and marketing them; and that the items are among the most popular and enduring in Yurman's entire line. Further, the former head of jewelry merchandising at Saks Fifth Avenue attests to the fact that the Yurman Trade Dress is a look consumers associate with Yurman.

3

Finally, this is not the trial. The issues presented by Yurman's claims are inherently fact intensive and rarely decided on summary judgment. At the very least, the overwhelming factual showing made by Yurman raises issues of fact as to critical determinations the jury will be called upon to make: whether, on Yurman's copyright claims, the ordinary lay observer (*not* the more discerning observer, as Andin argues) would regard the aesthetic appeal of the Yurman Copyrighted Enhancer and the Andin Ensemble as the same; and whether, on Yurman's trade dress claims, Yurman has shown (i) that the Yurman Trade Dress has developed secondary meaning, and (ii) that consumers at the point of sale, and friends, neighbors and passers-by who see the Andin Ensemble being worn, are likely to be confused by Andin's use of the identical combination of design elements used in the Yurman Trade Dress Items. These are classic jury issues, not to be decided here.

## STATEMENT OF FACTS

The relevant facts are summarized below, set forth in detail in the accompanying Response to Andin's Statement of Undisputed Facts, and in the declarations of (i) David Yurman, dated June 27, 2008 ("Yurman Decl."); (ii) Janet Hayward, dated June 27, 2008 ("Hayward Decl."); (iii) Carol Pennelli, dated June 27, 2008 ("Pennelli Decl."); Sue Ann Newberg, dated June 27, 2008 ("Newberg Decl."); and (iv) Louis S. Ederer, Esq., dated July 3, 2008 ("Ederer Decl."), as well as the exhibits attached thereto.

## ARGUMENT

**I.      Summary Judgment on Yurman's Copyright Infringement Claim Should Be Denied**

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression" including jewelry design. 17 U.S.C. § 102(a); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108-10 (2d Cir. 2001) ("*PAJ, Inc.*") (affirming judgment of copyright infringement in jewelry designs). Under the Copyright Act, a party seeking to establish

infringement must prove: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). To prove copying, the copyright owner must show: (1) copying of the protected work; and (2) substantial similarities between the works that are "probative of copying." *Jorgensen v. Epic/Sony Records*, 351 F .3d 46, 51 (2d Cir. 2003), *aff'd after remand*, 157 Fed. Appx. 427 (2d Cir. 2003), *cert. denied*, 547 U.S. 1154 (2004); *M. Lady, LLC v. AJI, Inc.*, No. 06 civ. 0194, 2007 WL 2728711, at *4 (S.D.N.Y. Sept. 19, 2007)

"Given the obvious fact-based nature of this inquiry, a grant of summary judgment on a claim of copyright infringement is exceedingly rare. A plaintiff must show that no reasonable trier of fact could find against it on any of the elements of proof, the most challenging of which may be proof of substantial similarity." *Axelrod & Cherveny Architects, P.C. v. Winmar Homes*, No. 2:05 711 ENV ETB, 2007 WL 708798, at *8 (E.D.N.Y. Mar. 6, 2007). "'Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation.'" *eScholar, LLC v. Otis Educ. Sys., Inc.*, No. 04 civ. 4051, 2005 WL 2977569, at *27 (S.D.N.Y. Nov. 3, 2005) (citations omitted).

Here, numerous issues preclude an award of summary judgment. For instance, Andin (i) erroneously claims independent creation relying on the assertion that in creating the infringing Andin Ensemble, it used the Vardi ring as inspiration, not the Yurman Copyrighted Enhancer (*Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995)); (ii) ignores the obvious similarity between the combination of design elements that make up the Yurman Copyrighted Enhancer and the Andin Ensemble, which raises issues of fact as to access, copying and substantial similarity (*Dan River, Inc. v. Sanders Sale Enters., Inc.*, 97 F. Supp. 2d 426, 429 (S.D.N.Y. 2000)); (iii) ignores that copyright protects the original combination of design elements in the

copyrighted work, not individual design elements (*Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); and (iv) erroneously applies the "more discerning" ordinary observer standard to deconstruct the Yurman Copyrighted Enhancer (*Yurman Design, Inc. v. Golden Treasure Importers, Inc.*, 275 F. Supp. 2d 506, 517 (S.D.N.Y. 2003) ("*Golden Treasure*")).

## A. Andin and Vardi Had Access to the Yurman Copyrighted Enhancer and Did Not Independently Create the Infringing Jewelry Designs

A party claiming copyright infringement must demonstrate that the defendant copied protected elements of the copyrighted work. Since direct evidence of copying is seldom available, "[c]opying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to protectible material in the two works." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert denied*, 476 U.S. 1159 (1986). Alternatively, if two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without showing access. *Lipton*, 71 F.3d at 471.

Here, Andin denies access to the Yurman Copyrighted Enhancer, making instead an interesting claim of (not so) "independent creation." It claims that the Andin Ensemble was copied from a ring it obtained from Vardi Gem, a party that, not surprisingly, has defaulted in this case. Even if this were true, "'innocent infringement,' or copying from a third source wrongfully copied from the plaintiff, without knowledge that the third source was infringing, does not absolve a defendant of liability for copyright infringement." *Lipton*, 71 F.3d at 471.[1] Further, Azrielant admitted at his deposition that he did nothing to investigate whether anyone claimed intellectual property rights in the design, despite the fact that he recalled seeing similar

---

[1] *See also* 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 13.08, at 13-285 (2007) (noting that "[t]hen there is the situation wherein the defendant's work is based upon a work furnished by a third party. The defendant's ignorance that such third party has wrongfully copied from the plaintiff will not immunize him from liability"); *Axelrod*, 2007 WL 708798, at *7.

designs in the marketplace, and despite having the ability to investigate, which is classic willful ignorance that should not be rewarded. Ederer Decl. Ex. 6, pp. 74-77.

Moreover, access may be inferred where a party had a reasonable opportunity to view a work before creating its own, as both Andin and Vardi did here. *See, e.g., Gaste v. Kaiserman*, 863 F.2d 1061, 1066-67 (2d Cir. 1988). Wide dissemination of plaintiff's work may serve as a basis for inferring access by the defendants. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998 (2d Cir.1983); *Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F. Supp. 1328, 1336 (S.D.N.Y.1997). Here, as the evidence shows, the Yurman Copyrighted Enhancer has been around for ten years, and is one of the most popular and enduring designs in Yurman's line, still selling steadily today.[2] Pennelli Decl. ¶ 5, Ex. 1; Hayward Decl. ¶ 20; Yurman Decl. ¶ 23. Moreover, Andin has not been living under a rock for the last ten years. It is a major player in the jewelry business, runs the hugely popular www.jewelry.com website, follows trends in the industry, and knows what Yurman is up to. Ederer Decl Ex. 6, pp. 104-07, 158-60, Ex. 8, pp. 18-22, 42-43. This evidence alone is sufficient to establish access.

Finally, where, as here, the items at issue all have the same exact combination of key design elements, it "'preclude[s] the possibility of independent creation, [and] "copying" may be proved without a showing of access.'" *Lipton*, 71 F.3d at 471 (citations omitted).[3] It cannot be coincidence that the Yurman Copyrighted Enhancer, the Vardi Ring, and the Andin Ensemble all

---

[2] Andin's claims that it or its former counsel were not able to find the Yurman Copyrighted Enhancer after receiving notice of Yurman's cease and desist letter does nothing to undermine the overwhelming evidence of Yurman's advertisement, promotion and sale of the Yurman Copyrighted Enhancer over the past ten years. Moreover, the undated declaration by Andin's former counsel is inadmissible hearsay, does not identify what retailers were contacted, who at each retailer provided the alleged information, how each retailer was contacted, or how the Yurman item in question was described.

[3] *See also Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004) (degree of access required is inversely proportional to degree of probative similarity, *i.e.*, where designs have a high degree of probative similarity, the amount of access required is minimal).

share the same combination of design elements, which as Yurman's witnesses state (and which even Azrielant has acknowledged), had never been used in jewelry history before Yurman did so. Yurman Decl. ¶¶ 20,25; Hayward Decl. ¶ 9; Ederer Decl. Ex. 6, p. 324.

So, even if Azrielant's tall tale about Vardi is true, this Court can infer simply by comparing the Vardi ring to the Yurman Copyrighted Enhancer that Vardi had access to Yurman's piece. *Lipton*, 71 F.3d at 471; *Axelrod*, 2007 WL 708798, at *7; Ederer Decl. ¶ 29, Ex. 21. Indeed, a simple comparison of the Yurman Copyrighted Enhancer and the Vardi ring, demonstrates the striking similarity, as the Vardi ring uses the same combination of design elements that give the Yurman Copyrighted Enhancer its aesthetic appeal. Ederer Decl. ¶¶ 3-6, Ex. 6, pp. 65-68 (photographic comparison of the Vardi ring and the Yurman Copyrighted Enhancer). We may never know the truth about Vardi, because after initially cooperating with Andin's former lawyer, the now-disqualified George Gottlieb (indeed, Gottlieb indicated that Andin would make Vardi available for deposition in this case), he subsequently stopped taking calls and has simply disappeared.[4] Ederer Decl. Ex. 6, pp. 65-68. His obvious copying of the design elements in the Yurman Copyrighted Enhance, however, implicates Andin as well, since Andin admittedly copied Vardi. At the very least, therefore, the question of access presents an issue of fact that precludes summary judgment.

**B.      Andin's Infringing Jewelry Designs are Substantially Similar to the Yurman Copyrighted Enhancer**

Andin also argues that Yurman's copyright infringement claim should be dismissed because (1) each of the elements of the Yurman Copyrighted Enhancer is in the public domain; (2) under the more discerning ordinary observer test, the Andin Ensemble is not substantially

---

[4] As a result, Vardi is a missing witness and an adverse inference may be drawn against Andin that Vardi had access to and copied the Yurman Copyrighted Enhancer. *Queenie, Ltd. v. Nygard Int'l*, 204 F. Supp. 2d 601, 604 n.2 (S.D.N.Y. 2002).

similar in appearance to the Yurman Copyrighted Enhancer; and (3) in any event, the items are

not substantially similar. Andin is wrong on all counts.

### 1.    It is the Combination of Design Elements, Not the Individual Elements, that Is Determinative

Andin contends that Yurman's copyright infringement claim should be dismissed because

the individual design elements used in the Yurman Copyrighted Enhancer are in the public

domain. This argument misapplies the clear law of this Circuit, which has long recognized that

copyright protects, particularly in jewelry design, the combination of design elements, not each

individual element. *PAJ, Inc.*, 262 F.3d at 109-10; *Golden Treasure*, 275 F. Supp. 2d at 515.

In *PAJ, Inc.*, the Second Circuit rejected the argument Andin makes here, determining

that while individual design elements may have been previously used, the overall designs were

still protected because "the originality in Yurman's . . . designs inheres in the ways Yurman has

recast and arranged those constituent elements." *Id.* at 110. Indeed, as the District Court in *Paj*

noted, Andin's position would leave little to protect by way of copyright:

> While PAJ's position is that none of Yurman Design's jewelry is protectible
> under the Copyright Act, because Yurman Design's pieces simply contain basic
> elements (jewels, cabochons, cable, gold and silver, etc.) commonly used
> throughout the jewelry industry, such a position would, writ large, swallow
> copyright law whole. To accept PAJ's argument that Yurman's pieces of jewelry
> are merely unprotectible agglomerations of basic design elements already within
> the public domain would be akin to accepting the position that every song is
> merely a collection of basic notes, every painting a derivative work of color and
> stroke, and every novel merely an unprotected jumble of words.

*Yurman Design, Inc. v. PAJ, Inc.*, 93 F. Supp. 2d 449, 457 (S.D.N.Y. 2000), *aff'd in part, rev'd*

*in part on other grounds,* 262 F.3d 101 (2d Cir. 2001).

Here, as Mr. Yurman himself states, it is not the individual design elements in the

Yurman Copyrighted Enhancer — the pave diamond cushion-shaped center, the use of gold, and

the use of cable — that make the design new and different. It is his "unique combination of

these design elements that has resulted in an overall look that is new, fresh, and distinct from anything previously available in the jewelry market." Yurman Decl. ¶ 24. Further, as Mr. Yurman indicates, his unique way of combining these of elements, is mimicked exactly in all of the items in the Andin Ensemble, as well as the Vardi ring that Andin purportedly copied.

### 2. This Court Should Analyze Substantial Similarity Under the Ordinary Observer Test

Based on the foregoing misapplication of the law, Andin argues that the Court should apply the "more discerning" ordinary observer test, which allows the trier of fact to throw out the public domain elements in a copyrighted work and look at what is left in determining similarity. The more discerning ordinary observer test, however, is not used in cases like this because it is the overall combination of elements that is subjected to the "public domain" test, not each individual element. Instead, the proper substantial similarity analysis is the Second Circuit's long-settled ordinary observer test. *Knitwaves, Inc.*, 71 F.3d at 1002 (citations omitted). Under this test two works are substantially similar if "'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" *Id.* (quoting *Peter Pan Fabrics Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)). An ordinary observer is "an average lay observer," not somebody with expertise in the area of the works at issue. *Knitwaves*, 71 F. 3d at 1002.[5]

As Judge Pitman recognized in *M. Lady, LLC*, 2007 WL 2728711 at *7, attempting to break down a piece of jewelry into its protectible and non-protectible elements for purposes of applying the more discerning ordinary observer test is improper because "'although the jewelry

---

[5] Indeed, the Second Circuit has cautioned that the "more discerning" ordinary observer test should not be broadly applied, stating "'[i]n applying this test, a court is not to dissect the works at issue into separate components and compare only the copyrightable elements,'" *Boone v. Jackson*, 206 Fed. Appx. 30, 33 (2d Cir. 2006) (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272-73 (2d Cir. 2001)).

designs . . . are created from a combination of common elements, the designs are protected *in their entirety* because it is the *combination of elements* that is copyrighted.'" *Id.* (quoting *Golden Treasure*, 275 F. Supp. 2d at 517 (emphasis in original)). Indeed, the defendant in *Golden Treasure* tried the same argument against Yurman that Andin advances here, to no avail. *Golden Treasure*, 275 F. Supp. 2d at 517 (noting that with respect to jewelry design, it is the combination of elements that is protected, "[i]t makes no sense . . . to look at the designs by excluding elements such as cable and gemstones and consider what is left.").

### C.    The Andin Ensemble is Substantially Similar to the Yurman Copyrighted Enhancer

Andin also argues that the items in the Andin Ensemble are not substantially similar to the Yurman Copyrighted Enhancer because the products at issue are not identical in their specifications, and look different when viewed from the side or back. But, as Mr. Yurman states, that is not how jewelry is viewed. Instead, "when you look at these pieces of jewelry from the front or top view, you see the same combination of design elements interacting with each other in exactly the same way. Indeed, if you look at the front or top view of the Andin pendant, which is how a consumer usually views a pendant, you see only one row of cable, just like what you see in the front or top view of the Yurman enhancer." Yurman Decl. ¶ 35. Further, while the pieces in the Andin ensemble do not have the same "millimeter for millimeter" specifications as the Yurman Copyrighted Enhancer, they clearly use what Yurman's copyright protects — "the same distinct combination of design elements that appear in the copyrighted Yurman pendant, [used] in the same manner, to give the Andin [items] the same aesthetic appeal." *Id.* ¶ 36.

It is well established that "a finding of substantial similarity is not precluded where differences in detail 'do little to lessen a viewer's overwhelming impression' that the defendant's products are 'appropriations.'" *PAJ, Inc.*, 262 F.3d at 111 (citations omitted); *Williams*, 84 F.3d

at 588. Such disparities are overlooked, if the ordinary observer would regard the overall aesthetic appeal of the designs as the same. *Knitwaves*, 71 F. 3d at 1002. Thus, the dissimilarities between the Yurman Copyrighted Enhancer and the Andin Ensemble do not preclude an ordinary observer's finding that the protected combination of design elements are substantially similar, where the aesthetic appeal is the same. *Tienshan, Inc. v. C.C.A. Int'l (N.J.), Inc.*, 895 F. Supp. 651, 659 (S.D.N.Y. 1995) ("'[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate'") (citation omitted).

Once again, a simple comparison of each item in the Andin Ensemble and the Yurman Copyrighted Enhancer demonstrates their striking similarity. Yurman Decl. ¶¶ 33-38, Exs. 5-7 (photographic comparisons of the Andin Ensemble and the Yurman Copyrighted Enhancer). The Andin pendant, earrings and ring all use the same combination of design elements that give the Yurman Copyrighted Enhancer its aesthetic appeal, interacting with each other in the same way. The fact that the Yurman Copyrighted Enhancer is a pendant, and the Andin Ensemble includes earrings and a ring is of no moment — all of Andin's items use the identical combination of design elements and have the same aesthetic intent.[6] Further, as Andin has admitted that the Vardi ring is substantially similar to the Yurman Copyrighted Enhancer, Andin's copying of the Vardi ring in designing the Andin Ensemble demonstrates that the Andin Ensemble is substantially similar to the Yurman Copyrighted Enhancer.

## II.    Summary Judgment on Yurman's Trade Dress Claims Should Be Denied

Section 43(a) of the Lanham Act protects a product's trade dress, where the trade dress indicates source of the product. 15 U.S.C. § 1125(a). "A product's trade dress encompasses the

---

[6] Similarly, Mr. Yurman categorically denies Andin's claim that he told Azrielant that he did not have a problem with Andin's ring design. Yurman Decl. ¶ 32.

overall design and appearance that make the product identifiable to consumers." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001). Product design trade dress is protected if it is not functional and has acquired secondary meaning. *PAJ, Inc.*, 262 F.3d at 115 (citation omitted). Further, "[a]lthough each element of a trade dress individually may not be [ ] distinctive, . . . the combination of elements may be indicative of source." *Jeffrey Milstein, Inc. v. Gerger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995).

Andin erroneously asserts that the Andin Ensemble does not infringe the Yurman Trade Dress because: (1) Yurman has failed to sufficiently articulate the Yurman Trade Dress; (2) Yurman has not made a showing of secondary meaning; and (3) no reasonable jury could find that consumers are likely to be confused and believe that the Andin Ensemble emanates from, or is sponsored by, Yurman. On the contrary, however, (1) Yurman has more than sufficiently articulated the elements of the Yurman Trade Dress (*Fibermark, Inc. v. Brownville Specialty Paper Prods., Inc.*, No. 7:02-cv-0517, 2005 WL 1173562, at *5 (N.D.N.Y. May 11, 2005)); (2) Yurman has made more than a threshold showing of secondary meaning (*Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 163, 169 (2d Cir. 1991); and (3) there is strong evidence of likelihood of confusion (*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)). Further, questions regarding the establishment of secondary meaning and the potential for confusion are inherently factual. *See, e.g., Coach Leatherware Co.*, 933 F.2d at 168.

## A.     Yurman Has Sufficiently Articulated its Trade Dress

A party asserting that a trade dress running through a series of products is entitled to protection "must articulate the specific common elements sought to be protected." *PAJ, Inc.*, 262 F.3d at 118. In addition the party must "establish[ ] that the 'overall look' in each separate product is 'consistent.' " *Id.* at 116 (citation omitted). In keeping with the law of this Circuit, Yurman has deliberately articulated its trade dress very narrowly and particularly as follows:

> (a)    a center or focal point consisting of a field of pave diamonds in a rectangular shape with rounded corners — an elongated "cushion" design;
>
> (b)    which is encircled by a smooth band of yellow gold providing the appearance of a platform for for the pave diamonds;
>
> (c)    which is, in turn, encircled by an outside trim of Yurman's signature cable design, or twisted wire, in sterling silver

Ederer Decl. Ex. 3, Amended Answer and Counterclaims ¶ 69. This very precise articulation more than meets the requirements for particularized articulation in this Circuit. *Cf. Coach, Inc. v. We Care Trading Co.*, 67 Fed. Appx. 626, 627-28 (2d Cir. 2002) (affirming articulation of trade dress for handbags limited to four elements in combination: "glove tanned leather, bound edges, brass (or nickel-plated brass) hardware, and a lozenge shaped hangtag attached to the bag with a beaded chain"), *cert. denied*, 537 U.S. 1108 (2003).

Andin argues speciously that Yurman has failed to articulate the Yurman Trade Dress with sufficient particularity because Mr. Yurman could not describe one of the design elements of the Yurman Trade Dress — the "signature" cable element. This argument is not only nonsensical (as Mr. Yurman can, and clearly does, explain what he means by "signature" cable (Yurman Decl. ¶ 28)), but also irrelevant, because, again, Yurman is not trying to protect this single design element across a line of goods; rather, : seeks to protect its unique combination of multiple design elements used consistently throughout the Yurman Trade Dress Items.

## B.    The Yurman Trade Dress Has Achieved Secondary Meaning

Contrary to Andin's assertion, Yurman has made a substantial showing that its trade dress has achieved secondary meaning. Indeed, Yurman has proffered substantial evidence on each of the factors considered in determining secondary meaning, including the substantial advertising and sales of the Yurman Trade Dress Items; the significant unsolicited media coverage these items have received; the many third party attempts to plagiarize the Yurman Trade Dress; and

Yurman's eight years of exclusive use of its trade dress — all of which strongly support a finding of secondary meaning. *See, e.g., Coach Leatherware*, 933 F.2d at 169.

At the very least, the evidence proffered by Yurman raises issues of fact as to whether the Yurman Trade Dress has achieved secondary meaning. The presence of secondary meaning is a factual determination, proof of which entails vigorous evidentiary requirements, and which is typically decided by a jury. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992); *see also Coach Leatherware*, 933 F.2d at 169 (finding that the careful weighing of evidence necessary to determine secondary meaning renders it an unlikely candidate for summary judgment); *Johnson & Johnson v. Actavis Group hf*, No. 06 civ. 8209, 2008 WL 228061, at *2 (S.D.N.Y. Jan. 25, 2008); *Gross v. Bare Escentuals Beauty, Inc.*, No. 03 civ. 3089, 2008 WL 2332307, at *5 (S.D.N.Y. June 4, 2008).

### 1. Yurman's Advertising Expenditures for the Yurman Trade Dress Supports a Finding of Secondary Meaning

Yurman has spent millions of dollars advertising and promoting the Yurman Trade Dress Items. Pennelli Decl. ¶¶ 8-11, Exs. 4-5; Hayward Decl. ¶ 16. Where, as here, a party "produce[s] some evidence of advertising . . . the question cannot be resolved on summary judgment . . . ." *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 194, 207 (C.D. Conn. 2004). Further, any argument that Yurman's advertising was directed to Yurman's Silver Ice Collection, of which the Yurman Trade Dress Items are a part, and not the particular Yurman Trade Dress Items presents an issue of fact. *E-Z Bowz, LLC v. Professional Prod. Research Co.*, No. 00 civ. 8670, 2003 U.S. Dist. LEXIS 15364, *62-63 (S.D.N.Y. Sept. 5, 2003) (argument that plaintiff's advertising expenditures pertained to "entire product line" and not products at issue went to "the strength of [plaintiff's] evidence — not its existence — and [was] insufficient to result in a grant of summary judgment for [defendant]").

### 2.    Unsolicited Media Coverage of the Yurman Trade Dress Items Supports a Finding of Secondary Meaning

Yurman has proffered proof of substantial unsolicited media coverage of the Yurman Trade Dress Items. Hayward Decl. ¶ 19, Ex. 3; Pennelli Decl. ¶ 11. Again, "[d]etermining the weight to accord this evidence [of media attention] is properly a question for a trier of fact and not a court on summary judgment." *New Colt*, 312 F. Supp. 2d at 208.

### 3.    Sales Success of the Yurman Trade Dress Supports a Finding of Secondary Meaning

Since 1997, Yurman has sold nearly $30 million dollars worth of the twelve Yurman Trade Dress Items at retail. Pennelli Decl. ¶¶ 5-6, Exs. 1-3. This sales success alone supports a finding of secondary meaning. *See, e.g., Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 242-43 (S.D.N.Y. 2004). Moreover, Andin's argument that the sales of the Yurman Trade Dress Items have declined in recent years does not require a different outcome. The items in question are staples in Yurman's line and continue to sell steadily. Hayward Decl. ¶ 20; Yurman Decl. ¶ 23; Pennelli Decl. ¶ 5. In any event, comparisons of past and recent sales success go to the weight of the evidence, and "[a]ttempting to resolve that question would be inappropriate on summary judgment." *New Colt*, 312 F. Supp. 2d at 208.

### 4.    Attempts to Plagiarize Yurman's Trade Dress Supports a Finding of Secondary Meaning

Andin claims first, that there are third parties who are using the Yurman Trade Dress, and second, that there is no evidence that Yurman has taken action against any of these parties. While the first statement is true (and, in fact, supports a finding of secondary meaning), the second is not. In point of fact, Yurman has shown both several prior third party attempts to free ride on the Yurman Trade Dress, as well as evidence that Yurman has taken action against these plagiarists. Ederer Decl. ¶¶ 22-23, Ex. 14-15.

5.    **Length and Exclusivity of Yurman's Use of the Yurman Trade Dress Supports a Finding of Secondary Meaning**

Andin wrongly argues, relying only on third party knockoffs of the Yurman Trade Dress sold in 2005-2007, that Yurman did not have a sufficient period of exclusive use for its trade dress to have achieved secondary meaning. Andin even makes the entirely unsubstantiated claim that there is evidence of third party use of the trade dress *before* Yurman.[7] All of Andin's examples of third party use, however, are from 2005-2007, long after Yurman established its trade dress. Yurman Decl. ¶ 30; *see, e.g., Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 353 (S.D.N.Y. 1998) (length and exclusivity of use "is evaluated in light of the nature of the product and its consumers . . . . Thus, there is no set period of time that, if reached, will automatically give a mark secondary meaning status"). Indeed, it is no coincidence that the third party copiers came along only after Yurman created a market for, as well as consumer recognition of, its unique and innovative designs. Pennelli Decl. ¶¶ 5-6, 8-11, Exs. 1-5.

Further, the reaction of Finlay's and J.C. Penney demonstrates that Yurman has established secondary meaning. Both customers indicated they wanted to stay away from the Andin Ensemble because it copied a well-known Yurman look.[8] Ederer Decl. Exs. 6, pp. 24, 28-29, 34, 35; 22. Moreover, Sue Ann Newberg, head of merchandising for Saks Fifth Avenue for five years, testifies that the Yurman Trade Dress Items have a known look among jewelry consumers, indicating Yurman as the source of the goods. Newberg Decl. ¶¶ 8-10.[9]

---

[7] Not only is this claim without factual support, it conflicts with Azrielant's testimony that he was not aware of any similar jewelry designs that predated the Yurman Copyrighted Enhancer. Ederer Decl. Ex. 6, p. 324.

[8] Notably, Andin has refused to provide adequate discovery regarding communications with Finlay's concerning the Andin Ensemble. Indeed, despite several demands by Yurman's counsel and Andin's counsel's promise that a thorough computer search would be undertaken and responsive documents produced, to date no communications between Andin and Finlay's have been produced. Ederer Decl. ¶¶ 7-13, Ex. 5.

[9] *See, e.g., U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 172 (S.D.N.Y. 2001) (denying summary judgment for non-infringement of trade dress in part because of declarations that stated the product's look was

Footnote continued on next page

**C.    Yurman Has Made a Threshold Showing of Likelihood of Confusion**

Andin argues that Yurman has failed to make a threshold showing of likelihood of confusion. For Andin to prevail on this argument, this Court must find that no reasonable jury could conclude there is a likelihood of confusion as to the source of the Andin Ensemble under the Second Circuit's well-established *Polaroid* factors. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820 (1961). This is appropriate only where the evidence raises no issues of fact as to any of the *Polaroid* factors. *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996). These factors include: (1) the strength of the trade dress; (2) the similarity between the two trade dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of defendant's product; and (8) the sophistication of the relevant consumer group. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002-03 (2d Cir. 1997).

Here, Yurman has demonstrated that each of the *Polaroid* factors tips in its favor, or at least has raised an issue of fact as to them, precluding summary judgment. Further, since no one factor is controlling, if a reasonable jury could find in favor of Yurman on any of the *Polaroid* factors, likelihood of confusion may not be resolved on summary judgment. *Cadbury*, 73 F.3d at 478; *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 215 (2d Cir. 2003).

**1.    Strength of the Yurman Trade Dress Supports Likelihood of Confusion**

As the U.S. Supreme Court has determined that product design can never be inherently distinctive, the strength of any given trade dress turns on the evidence of secondary meaning.

---

Footnote continued from previous page
unique and distinctive in the industry, was used consistently over an extended period of time, and could be used to identify source) (citation omitted).

*Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212 (2000). "'The same type of evidence may support a claim concerning the strength of a mark and a claim concerning secondary meaning.'" *Cartier v. Samo's Sons, Inc.*, No. 04 civ. 2268 RMB DFE, 2005 WL 2560382, at *6 (S.D.N.Y. Oct. 11, 2005) (citation omitted). As discussed in detail above, there is ample evidence to demonstrate that Yurman's trade dress has acquired great strength. *See, supra* at pp. 14-17; Pennelli Decl. ¶ 5; Hayward Decl. ¶ 20; Newberg Decl. ¶¶ 8, 10.

### 2. Similarity of the Yurman Trade Dress and the Andin Ensemble Supports Likelihood of Confusion

In assessing similarity of the marks, courts look to the "overall impression" they create and "the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Lexington Mgmt. Corp. v. Lexington Capital Partners,* 10 F. Supp. 2d 271, 283-84 (S.D.N.Y. 1998) (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)). Here, the Andin Ensemble uses the same combination of design elements in the same general arrangement, proportion, and shape as the Yurman Trade Dress. Yurman Decl. ¶¶ 39-43, Exs. 9-11. That the cushions in the two pieces may be slightly different sizes, or that the twist in the cable may vary slightly from the Andin pieces to Yurman's trade dress, does not change the overall concept and feel of the pieces, which share the same aesthetic appeal. Yurman Decl. ¶ 35. *Perfect Fit Indus. v. Acme Quilting Co.,* 618 F.2d 950, 954-55 (2d Cir. 1980) ("[w]hile there are some differences . . . , 'it is the combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public'") (citation omitted), *cert. denied*, 459 U.S. 832 (1982).

Notwithstanding the foregoing, "[c]ourts are instructed to proceed very carefully with respect to the similarity of the overall impression of trade dress, because issues of consumer

confusion are normally factual in nature and thus rarely appropriate for summary judgment."
*Deere & Co. v. MTD Holdings Inc.*, No. 00 civ. 5936, 2004 WL 324890, at *13 (S.D.N.Y. Feb.
19, 2004). Certainly, on the present record and under the relevant law, at minimum, questions of
fact abound on this factor, precluding summary judgment.

### 3. Proximity of the Products and Bridging the Gap Supports Likelihood of Confusion

The competitive proximity analysis "requires inquiry into the classification of the
products, the channels of trade through which the products move and their customer profiles."
*Nikon, Inc. v. Ikon Corp.*, 803 F. Supp. 910, 917 (S.D.N.Y. 1992). Andin paints a picture of
entirely disparate channels of trade, where lower income customers of JC Penney and Sam's
Club have never heard of Yurman, much less dreamed of setting foot in a so-called "luxury
retailer." The evidence, however, is otherwise. Today's consumers cannot be so narrowly
pigeon-holed. Indeed, Gail Campbell, Sam's Club's senior buyer of fine jewelry and watches,
testified that Sam's Club competes with such renowned retailers as Tiffany & Co. for jewelry
customers, and that typical Sam's Club customers range across a wide variety of social and
economic backgrounds. Ederer Decl. Ex. 10, pp. 35-36.

Further, despite Andin's attempt to label retail outlets such as J.C. Penney and Sam's
Club as a mid-market retailers and discounters, who price their jewelry items to target
individuals with typical household incomes of $40,000 to $90,000, both stores sell jewelry items
at prices in the thousands of dollars. Ederer Decl. Exs. 18-19. On the other hand, Yurman items
may sell for as little as $295. Penelli Decl. ¶ 13. As a result, jewelry sold at J.C. Penney and
Sam's Club compete directly with Yurman items. Moreover, with the recent trend towards
"diffusion" lines — brand name designer items offered at lower prices — consumers expect to
find designer products at stores such as J.C. Penney and Sam's Club. Pennelli Decl. ¶ 17.

Finally, it is undisputed that Yurman and Andin both sell to Finlay's and therefore these products may be found in the same retail locations.  Ederer Decl. Ex. 6, pp. 10-11; Pennelli Decl. ¶ 12.

### 4.    Andin's Bad Faith Supports Likelihood of Confusion

"'This factor looks to whether the defendant adopted its [trade] dress with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'"  *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 457 (S.D.N.Y. 2000) (citations and internal quotation marks omitted).

Andin's conduct smacks of bad faith.  First, Andin justifies its copying of the Yurman Trade Dress by asserting that it was actually copying someone else.  Second, as Azrielant admits, although well-schooled in the area of intellectual property protection, and having been involved as a party in several intellectual property litigations, Andin did nothing to ensure that it was not infringing the rights of any other party.  Ederer Decl. Ex. 6, pp. 79-86, 91-96; 13.  This is classic willful blindness.[10]  Third, although Finlay's refused to buy the Andin ring because it was too similar to the Yurman Trade Dress, Andin subsequently sold thousands of the same jewelry items to J.C. Penney and Sam's Club, and even contributed $80,000 to support a national advertising campaign for these items.  Ederer Decl. ¶ 10, Ex. 6, pp. 22-25, 153-55.

Furthermore, "issues of good faith are not well-suited for disposition on a summary judgment motion."  *Orb Factory, Ltd. v. Design Science Toys, Ltd.*, No. 96 civ. 9469, 1999 WL 191527, at *13 (S.D.N.Y. April 7, 1999); *Cadbury*, 73 F.3d at 483 ("'[s]ubjective issues such as good faith are singularly inappropriate for determination on summary judgment'") (citation

---

[10]  *See Johnson & Johnson Consumer Companies, Inc. v. Aini*, 540 F. Supp. 2d 374, 396 (E.D.N.Y. 2008) ("'[w]illful infringement may be attributed to [a party's] actions where . . . he showed a reckless disregard for the owner's rights.'") (citing cases); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (evidence that defendants had been involved in infringement actions in the past may support a finding of bad faith and intent) (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995)).

omitted).  Andin's bad faith should be determined by a jury.

### 5.    The Quality of the Andin Ensemble Supports Likelihood of Confusion

If Andin's products are inferior, this *Polaroid* factor weighs in favor of Yurman.  *See, e.g., Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1066 (S.D.N.Y. 1991) ("the existence of inferior infringing goods strengthens a plaintiff's 'interest in protecting its reputation from debasement'") (citation omitted).  Here, the Andin Ensemble is clearly inferior to the quality found in the Yurman Trade Dress Items.  Ederer Decl. Ex. 11, pp. 161-64.

### 6.    The Sophistication of Consumers Supports Likelihood of Confusion

Yurman disputes Andin's assertion that jewelry purchases are typically marked with a great deal of care on the part of the consumer.  As Ms. Pennelli states, "[j]ewelry consumers buy what they like.  Thus, a less sophisticated consumer, who may be familiar with the Yurman look might see the Andin item in a store circular or physically on display at the point of sale, and believe it is a Yurman piece."  Pennelli Decl. ¶ 18.  Further, even if the purchaser of the Andin Ensemble is sophisticated, "the general assumption that sophisticated consumers are less likely to be confused is not absolute."  *Cartier*, 348 F. Supp. 2d at 246.  Indeed, sophisticated consumers may be the most susceptible to confusion as to association, *e.g.*, mistakenly believing that the junior user's products must be approved by the senior user when they carry its trade dress.  *Id.*; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  "[T]o the extent the sophisticated buyer is attracted to [Yurman's products] because of the exclusiveness of its [jewelry designs], [Yurman's] sales will be affected adversely by these buyers' ultimate realization that the pattern is no longer exclusive."  799 F.2d at 875-76.

Furthermore, as Ms. Campbell testified, one of the attractions of shopping for jewelry at Sam's Club is the notion of a "treasure hunt," meaning that consumers will find something new each time they shop with Sam's Club, and may not necessarily be surprised to see what they

believe to be Yurman jewelry designs. This is particularly true in view of the increasing trend towards diffusion lines, where consumers now come to expect finding brand name designer products in so-called "mid-market" or "discount" retailers. Pennelli Decl. ¶ 17.

Finally, as a general matter, "when 'there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion.'" *New Colt*, 312 F. Supp. 2d at 225 (citation omitted). And, as discussed below, even if a purchaser is sophisticated enough to discern the differences between the Yurman and Andin pieces, passersby in the post-sale context may not be. Pennelli Decl. ¶ 18. Accordingly, at the very least, questions of fact abound as to this factor.

### 7.    Actual Confusion Supports a Finding of Likelihood of Confusion

While Andin claims that Yurman has proffered no instances of actual confusion, Andin overlooks the fact that two of its three customers for these goods expressed concern that the items mimicked a popular Yurman look. Ederer Decl. Ex. 6, pp. 24, 28-29, 34-35; 22. Short of reported incidents of actual consumer confusion, which hardly ever surface in cases like this (especially where the items at issue were only sold for a few months), there can be no better evidence of actual confusion. Further, "'[i]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act.'" *Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005) (citing *Lois Sportswear*, 799 F.2d at 875).

### 8.    The Types of Confusion at Play Need to Be Resolved by a Jury

Andin's confusion analysis is purposely limited to the point of sale. Andin attempts to frame this issue solely around the experience of a consumer at the jewelry counter. While Yurman has proffered substantial evidence that even in that context, confusion is likely, Andin's argument ignores two other scenarios — initial interest confusion and post-sale confusion.

Confusion that creates initial interest, even if the consumer would eventually be

"unconfused" as to the source, works significant trademark injury and is, therefore, actionable. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987). Andin's motion fails to address the likelihood that consumers who viewed the Andin ensemble in a national, pre-Christmas *People* magazine advertisement seen by millions, were initially confused, for however brief a period, into believing that Yurman products could be found at Sam's Club. Consumers who were drawn to Sam's Club by this advertisement did not have the opportunity to carefully examine or handle the jewelry themselves until they arrived at Sam's Club, and even if they figured out then that the items were not Yurman's, and bought something else, Andin's conduct is actionable. *Cartier v. Symbolix, Inc.*, 454 F. Supp. 2d 175, 185-86 (S.D.N.Y. 2006) (image of infringing watch design in defendant's advertisement that might lead would be-purchaser to believe that defendant was offering genuine product was actionable as initial interest confusion).

Andin also fails to address the significant risk of post-sale confusion, which may exist even in the purchaser is not confused. That risk is especially high here where the parties' products remain in use and are intended for public display after being purchased. *Lois Sportswear*, 631 F. Supp. at 747 (noting that "[i]n this case, the mark is likely to be viewed frequently in a non-sale setting after point of sale labels are removed and cause confusion among both prospective customers and the general public"). Here, the minor differences in the designs of the parties respective pieces are so small as to be hardly visible to the naked eye, particularly in the post-sale context where the viewer may catch only a glimpse. Yurman Decl. ¶¶ 31, 33-43, Exs.5-10; Pennelli Decl. ¶ 18. Jewelry products are particularly susceptible to post-sale confusion, because they often contain no markings, and the trade dress is their signature. *Lois Sportswear*, 631 F. Supp. at 747 ("[a]lthough 'permanent' markings bearing the [parties'] names remain on the products after the point of sale, the limited degree to which they would be visible

in a public setting obviates any ability they might have to reduce the possibility of confusion").

At the very least, Yurman has demonstrated issues of fact as to initial interest and post-sale

confusion, in addition to point of sale confusion.

### D.    Proof of Willfulness Is Not Needed for An Accounting of Andin's Profits

Andin asserts that Yurman cannot prove bad faith and therefore Andin is entitled to

summary judgment on Yurman's claim for Andin's profits. However, in addition to the fact that

Yurman has proffered substantial evidence of Andin's bad faith, Andin's argument misstates the

law. Recent cases within this Circuit have held that, in view of the 1999 amendments to § 35(a)

of the Lanham Act, willfulness is no longer a prerequisite for an accounting of profits. *See, e.g.,*

*Nike, Inc. v. Top Brand Co.*, No. 00 civ. 8179, 2005 WL 1654859, at *9-11 (S.D.N.Y. July 13,

2005); *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 172-73 (S.D.N.Y. 2007).

Accordingly, even if the Court determined that Yurman could not prove bad faith, Andin would

still not be entitled to summary judgment on Yurman's claim for profits.

## CONCLUSION

For the foregoing reasons, the Court should deny Andin's motion for summary judgment.

Dated:  New York, New York
        July 3, 2008

Respectfully submitted,

ARNOLD & PORTER LLP

By: _____
    Louis S. Ederer
    Marla Eisland Sprie
    John Maltbie
    Arnold & Porter LLP
    399 Park Avenue
    New York, New York 10022
    (212) 715-1000

*Attorneys for Defendant-Counterclaimant*

25