**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- x

ANDIN INTERNATIONAL, INC.                  :          Civil Action No. 08 cv 1159 (HB)

          Plaintiff,                      :

    - against -                            :

YURMAN STUDIO, INC.                        :

          Defendant.                      :

                                           :

------------------------------------------------------- x

YURMAN STUDIO, INC.                        :

          Defendant-                      :
          Counterclaimant,                :

    - against -                            :

ANDIN INTERNATIONAL, INC.                  :
and VARDI GEM LUSTRE, LLC                  :

          Counterclaim-                   :
          Crossclaim Defendants.          :

                                           :

------------------------------------------------------- x

**DEFENDANT-COUNTERCLAIMANT YURMAN STUDIO, INC.'S**
**COUNTERSTATEMENT OF MATERIAL FACTS PURSUANT**
**TO LOCAL RULE 56.1 IN OPPOSITION TO ANDIN**
**INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Rule 56.1 of the Local Civil Rules of the United States District Court

for the Southern District of New York, Defendant-Counterclaimant Yurman Studio, Inc.

("Yurman") respectfully submits this response to the statement of material facts submitted by

Andin International, Inc., ("Andin") in support of its motion for summary judgment.

**Statement No. 1**

Andin is a designer, manufacturer and marketer of jewelry and its customers include
major retailers throughout the United States. <u>Authority</u>: Azrielant Dec. at ¶ 2.

**Yurman's Response To Statement No. 1**:

Not disputed.

**Statement No. 2**

Andin creates approximately 4,000 new jewelry products each year. <u>Authority</u>: Azrielant
Dec. at ¶ 2.

**Yurman's Response To Statement No. 2**:

Yurman disputes that Andin creates "new" jewelry products each year. Mr. Azrielant

testified that Andin "frequently" provides its merchandisers or designers with an existing product

or a photograph of an existing product and asks them to create an item with the same look.

Ederer Decl. Ex. 6 pp. 111-114. The Andin ring, pendant, and earring at issue in this case

(collectively, the "Andin Ensemble") are examples of this. They copy the unique combination of

design elements in the Yurman Copyrighted Enhancer, which design elements are also embodied

in a series of highly distinctive Yurman jewelry items -- namely, (a) center or focal point

consisting of a field of pave diamonds in a rectangular shape with rounded corners -- an

elongated "cushion" design; (b) which is encircled by a smooth band of yellow gold providing

the appearance of a platform for the pave diamonds; (c) which is, in turn, encircled by an outside

trim of Yurman's signature cable design, or twisted wire, in sterling silver (the "Yurman Trade

Dress"). Yurman has designed at least twelve items that incorporate the Yurman Trade Dress

(the "Yurman Trade Dress Items").  Ederer Decl. Ex. 3 at ¶ 69;  Yurman Decl. ¶¶ 18, 22, Exs. 1-3.

## Statement No. 3

Defendant Yurman Studio, Inc. ("Yurman") alleges ownership of United States Copyright Registration No. VA 1-024-276, issued August 21, 2000 for a work entitled Pave Collection Enhancer D06384 (hereinafter "the Yurman Enhancer").  <u>Authority</u>: Azrielant Dec. at ¶ 5.

## Yurman's Response To Statement No. 3:

Not disputed.

## Statement No. 4

In 2007, Andin was provided was given (sic) a ring by Mr. Moshe Vardi (the "Vardi Ring").  <u>Authority</u>: Azrielant Dec. at ¶ 6 and Ex. B.

## Yurman's Response To Statement No. 4:

Yurman disputes the factual assertions in Statement No. 4, as it is not in possession of sufficient knowledge to admit or deny whether or when Andin was provided with a ring by Mr. Moshe Vardi.  Moshe Vardi, the principal of defendant Vardi Gem Lustre, first avoided service of a third party subpoena, and then disappeared when his company was added as a counterclaim-defendant.  Indeed, Mr. Azrielant testified that after Mr. Vardi's company was named as a counterclaim-defendant, Mr. Vardi became "scarce" and stopped returning his calls. Accordingly, Mr. Vardi is a missing witness in this litigation, and any facts relating to his actions with the so-called Vardi Ring are disputed.  Ederer Decl. Exs. 3, 4, 6 pp. 65-68.

## Statement No. 5

The Vardi Ring – or one that was substantially similar – was featured in a Mother's Day advertisement from Macy's in 2006.  <u>Authority</u>: Azrielant Dec. at ¶ 9 and Ex. C.

**Yurman's Response To Statement No. 5**:

Yurman disputes the factual assertions in Statement No. 5, as it is not in possession of sufficient knowledge to admit or deny whether the so-called Vardi Ring is the ring that appears in the advertisement attached as Ex. C to Mr. Azrielant's declaration. Further, Yurman disputes the factual statements in paragraph 5 to the extent that they are intended to imply that Andin did not copy the combination of key design elements in the Yurman Copyrighted Enhancer, or that Yurman did not have exclusive use of the Yurman Trade Dress because third parties have been using it concurrently. Yurman designed the Yurman Copyrighted Enhancer in 1997, and the other Yurman Trade Dress Items during the period 1997 to 2004. Yurman Decl. at ¶¶ 18, 22. The so-called Vardi Ring is a knockoff of Yurman's well-known popular designs, and did not surface until 2006 at the earliest. Yurman Decl. at ¶¶ 29-30. Yurman did not learn about the so-called Vardi Ring until this suit.

**Statement No. 6**

Ofer Azrielant provided the Vardi Ring to Ramona Azulay and asked her to create a ring inspired by the Vardi Ring. Authority: Azrielant Dec. at ¶ 10; Azulay Dec. at ¶ 5.

**Yurman's Response To Statement No. 6**:

Yurman disputes the factual assertions in Statement No. 6, as it is not in possession of sufficient knowledge to admit or deny whether the ring Mr. Azrielant alleges he provided to Ms. Azulay was the so-called Vardi Ring. Further, Yurman disputes the factual statements in paragraph 6 to the extent that they are intended to imply that Andin did not copy the combination of key design elements in the Yurman Copyrighted Enhancer or the Yurman Trade Dress. The so-called Vardi Ring is a knockoff of Yurman's well know popular designs and did not surface until 2006. Yurman Decl. at ¶¶ 29-30. Yurman did not learn about the so-called Vardi Ring until this suit.

4

**Statement No. 7**

At the time Mr. Azrielant received the Vardi Ring in early 2007, the Yurman Enhancer was unknown to him, and remained unknown to him until the present dispute started. Authority: Azrielant Dec. at ¶ 12.

**Yurman's Response To Statement No. 7**:

Disputed. Mr. Azrielant's self-serving claim that the Yurman Copyrighted Enhancer was unknown to him defies credibility. Ample circumstantial evidence demonstrates that Mr. Azrielant had access to and was aware of the Yurman Copyrighted Enhancer. Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

Yurman jewelry is well-known in the industry. Terry Ghirozi, a buyer for J.C. Penney, testified that "anybody in the jewelry business knows who David Yurman is." Ederer Decl. Ex. 7 p. 81. Mr. Azrielant admitted familiarity with David Yurman and his designs. He testified that he has known of Yurman's company for "probably twenty years," that he has met David Yurman at industry events, that he knew of some of Yurman's designs, and that until six or seven years ago he would occasionally stop to see Yurman's product at Bloomingdales. Ederer Decl. Ex. 6 pp. 61, 158-60. Others associated with Andin also admitted familiarity with David Yurman. For example, Ms. Azulay, a consultant to Andin and former Director of Merchandising for Silver and Gold, testified that she has seen Yurman products in magazines, and in stores and that there are pieces that if she saw she would assume to be Yurman because of their size and scale. Ederer Decl. Ex. 8 pp. 5, 10, 42-43. Marilyn William's, Vice President of Sales and Strategic Planning, testified: "When I think of Yurman, I think of Silver." Ederer Decl. Ex. 9 p. 30-31.

Yurman products in general are well known by consumers for having a very distinctive look, and the combination of features embodied in the Yurman Copyrighted Enhancer is one of the looks for which David Yurman has become well known. Newberg Decl. ¶¶ 5, 8.

In the years immediately following its launch in 1997, the Yurman Copyrighted Enhancer as well as several other Yurman items with the same unique combination of design elements used in the Yurman Copyrighted Enhancer were heavily promoted in advertising circulars sent to customers, in newspapers and other print advertisements, and through in-store events. Hayward Decl. ¶¶ 13-14. Other items with the same unique combination of design elements seen in the Yurman Copyrighted Enhancer, created in the years following the launch of the Yurman Copyrighted Enhancer, were similarly promoted upon their launch. Pennelli Decl. ¶¶ 8-9. The Yurman Copyrighted Enhancer was extremely popular when it first launched and remains part of Yurman's current collection. Yurman Decl. ¶ 23.

Moreover, Mr. Azrielant testified that he did nothing to satisfy himself that the so-called Vardi Ring, which Andin allegedly copied in order to create the Andin Ensemble was not a knockoff or infringement of the Yurman Copyrighted Enhancer or the Yurman Trade Dress. Ederer Decl. Ex. 6 p. 74. Andin owns over 1500 copyrights and has been involved in several infringement actions. Thus, even if it was not aware of the Yurman Copyrighted Enhancer, it had the expertise and capability to investigate whether the Andin Ensemble was infringing. Ederer Decl. Ex. 13.

Based on all the foregoing reasons, and other facts referenced in Yurman's accompanying memorandum of law, it is therefore reasonable to infer that Andin had access to and copied the Yurman Copyrighted Enhancer.

**Statement No. 8**

Ms. Azulay, who oversaw the design of the new ring (hereinafter the "Andin Ring"), had never seen the Yurman Enhancer prior to this dispute.  Authority: Azulay Dec. at ¶¶ 10-11.

**Yurman's Response To Statement No. 8**:

Disputed.  Ms. Azulay's self-serving claim that she had never seen the Yurman

Copyrighted Enhancer prior to this dispute defies credibility.  Ample circumstantial evidence

demonstrates that Ms. Azulay had access to the Yurman Copyrighted Enhancer.  Ederer Decl.

Ex. 7 p. 81, Ex. 5 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8;

Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶ ¶ 8-11.  *See also* Response to

Statement No. 7 above.

Ms. Azulay has been involved in merchandising, marketing and product development in

the jewelry business for over 12 years.  Azulay Decl. ¶ ¶ 2-3.  Ms. Azulay herself admitted

familiarity with David Yurman and his designs.  She testified that she has seen Yurman products

in magazines, and in stores and that there are pieces that if she saw she would assume to be

Yurman because of their size and scale.  Ederer Decl. Ex. 8 pp. 42-43.  Moreover, Ms. Azulay

testified that she did nothing to determine whether the so-called Vardi Ring which Andin

allegedly copied to create the Andin Ensemble was not a knockoff of the Yurman Copyrighted

Enhancer or the Yurman Trade Dress.  Ederer Decl. Ex. 8 p. 29.

**Statement No. 9**

Andin's salespeople, who were not involved with the creation of Andin's accused products, never came into contact with the Yurman Enhancer.  Authority: Williams Dec. at ¶ 14; Lyle Dec. at ¶ 10.

**Yurman's Response To Statement No. 9**:

Denied.  Ample circumstantial evidence demonstrates that Ms. Williams, Mr. Lyle, and

other Andin salespeople had access to the Yurman Copyrighted Enhancer.  Ederer Decl. Ex. 7 at

p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward

Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶ ¶ 8-11.  *See also* Response to Statement No.

7 above.  Indeed, Ms. Williams herself admitted familiarity with David Yurman and his designs.

Ederer Decl. Ex. 9 at p. 31.

**Statement No. 10**

Gail Campbell, a buyer of jewelry for Sam's Club – one of the largest jewelry retailers in
the country – had not seen the Yurman Enhancer prior to the current dispute.  Authority:
Azrielant Dec. Ex. Z at 87-88.

**Yurman's Response To Statement No. 10**:

Disputed.  Ample circumstantial evidence demonstrates that Ms. Campbell had access to

the Yurman Copyrighted Enhancer.  Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-

43, Ex. 9 p. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli

Decl. ¶¶ 8-11.  *See also* Response to Statement No. 7 above.  Indeed, Ms. Campbell herself

admitted familiarity with the David Yurman brand.  Ederer Decl. Ex. 10 p. 88.

Yurman further disputes the statement that Sam's Club is one of the largest jewelry

retailers in the country, as it does not have sufficient knowledge to admit or deny, and no factual

basis for such statement has been provided.  Whether Sam's Club is one of the largest jewelry

retailers is not material to this action.

**Statement No. 11**

Terry Ghirozi, a buyer for JC Penney – also one of the largest jewelry retailers in the
country – had not seen the Yurman Enhancer prior to this dispute.  Authority: Azrielant Dec. Ex
AA at 79-80.

**Yurman's Response To Statement No. 11**:

Disputed.  The authority cited by Andin does not support the factual assertion in

Statement No. 11.  After being shown a picture of the Yurman Copyrighted Enhancer, Ms.

Ghiorzi testified that although she did not know who designed or manufactured the pendant in

the picture, she associated it with David Yurman.  Ederer Decl. Ex. 7 pp. 79-81.  Moreover,

when Ms. Ghiorzi's supervisor, Beryl Raff, learned of the dispute that led to this lawsuit, Ms.

Raff, the Executive Vice President of Fine Jewelry for J.C. Penney, told Mr. Azrielant, in effect,

that had she focused on the items, J.C. Penney would not have purchased them, because they

looked too much like Yurman.  Ederer Decl. Ex. 6 p. 34-37, Ex. 22.  *See also* Response to

Statement 7.

Yurman further disputes the statement that J.C. Penney is one of the largest jewelry

retailers in the country, as it does not have sufficient knowledge to admit or deny, and no factual

basis for such statement has been provided.  Whether J.C. Penney is one of the largest jewelry

retailers in the country is not material to this action.

**Statement No. 12**

The only jewelry that served as inspiration for Andin's accused products was the Vardi
Ring.  Authority: Azrielant Dec. at ¶ 10-13; Azulay Dec. at ¶¶ 7, 9.

**Yurman's Response To Statement No. 12**:

Disputed.  The items in the Andin Ensemble appropriate the total concept and aesthetic

intent of the Yurman Copyrighted Enhancer and the Yurman Trade Dress Items.  In addition,

each of the Andin items contains the same combination of elements in the same arrangement,

proportion, and shape as their counterpart piece(s) in the Yurman collection.  Moreover, the so-

called Vardi Ring which allegedly served as Andin's "inspiration" is a knockoff of a ring

Yurman has had in its line for years and uses the unique combination of design elements used in

the Yurman Copyrighted Enhancer. Thus, indirectly, if not directly, the Yurman designs served as inspiration for Andin's products. Yurman Decl. ¶¶ 29, 39-43.

**Statement No. 13**

The Yurman Enhancer does not even appear on Yurman's website. <u>Authority</u>: Azrielant Dec. at ¶ 14 and Ex. E.

**Yurman's Response To Statement No. 13**:

Not disputed. Yurman's website does not currently feature the Yurman Copyrighted Enhancer because, like any company in the fashion industry, "Yurman focuses its promotion efforts primarily on its newest and most current designs." Hayward Decl. ¶ 17, Pennelli Decl. ¶ 7. The Yurman Copyrighted Enhancer was launched in 1997. Nevertheless, it still sells steadily and is still available at various retailers. Yurman Decl. ¶ 23; Pennelli Decl. ¶ 5.

**Statement No. 14**

Prior counsel for Andin inspected several known major retailers of Yurman's products throughout the country, and no such piece was found at these locations. <u>Authority</u>: Azrielant Dec. Ex. F at ¶ 7.

**Yurman's Response To Statement No. 14**:

Disputed. The undated declaration by Andin's former counsel, now disqualified, is inadmissible hearsay, does not identify what retailers were contacted, who at each retailer provided the alleged information, how each retailer was contacted, or how the Yurman item in question was described. Azrielant Decl. Ex. F. Moreover, Andin did in fact purchase the Yurman Copyrighted Enhancer, as well as a Yurman ring, one of the Yurman Trade Dress Items, that matches up virtually identically to the ring in the Andin Ensemble. Azulay Decl. ¶¶ 12, 14; Yurman Decl. ¶¶ 39-43. In addition, there is ample evidence that the Yurman Copyrighted Enhancer was available at several retailers during this period. Pennelli Decl. ¶ 5, Ex. 2.

**Statement No. 15**

David Yurman admitted that the Andin Ring does not infringe the copyright in the Yurman Enhancer. <u>Authority</u>: Azrielant Dec. at ¶ 27.

**Yurman's Response To Statement No. 15**:

Disputed.  Yurman Decl. ¶ 32.  Mr. Yurman categorically denies that he made the

"admission" attributed to him in Statement No. 15.  Yurman Decl. ¶ 32.

**Statement No. 16**

The Andin Ring was first shown by Andin to the trade at the JCK jewelry show in Las Vegas, in June 2007. <u>Authority</u>: Azrielant Dec. at ¶ 16; Williams Dec. at ¶ 15.

**Yurman's Response To Statement No. 16**:

Yurman disputes the facts alleged in Statement No. 16 as it lacks sufficient knowledge to

admit or deny whether the ring product that is part of the Andin Ensemble was first shown by

Andin to the trade at the JCK jewelry show in Las Vegas, in June 2007.

**Statement No. 17**

Customers requested that the Andin Ring be offered along with an ensemble, comprised of a pendant (hereinafter the "Andin Pendant") and a pair of earrings (hereinafter the "Andin Earrings"). <u>Authority</u>: Azrielant Dec. at ¶ 17 and Exs. G and H.

**Yurman's Response To Statement No. 17**:

Disputed.  Ms. Azulay testified that the ring, pendant, and earring in the Andin Ensemble

were all designed in February 2007, prior to the June jewelry show at which Andin allegedly first

showed the ring to customers.  Ederer Decl. Ex. 8 p. 35.  Ms. Williams, the Andin salesperson

responsible for the Sam's Club account, testified that Sam's Club did not specifically ask Andin

to create a pendant and earring.  Ederer Decl. Ex. 9 p. 47.

**Statement No. 18**

The Andin Pendant and Andin Earrings were created solely to match the Andin Ring. <u>Authority</u>: Azrielant Dec. at ¶ 17.

**Yurman's Response To Statement No. 18**:

Disputed. See Response to Statement No. 17. The pendant, earring, and ring pieces that make up the Andin Ensemble were all designed at the same time. Ederer Decl. Ex. 8 p. 35. All three items have the identical combination of design elements which, not coincidentally, is the same combination of design elements found in the Yurman Copyrighted Enhancer and the Yurman Trade Dress Items. In addition, the pendant and earring in the Andin Ensemble contain the same combination of elements in the same arrangement, proportion, and shape as their near-identical counterpart piece(s) in the Yurman collection. Yurman Decl. ¶¶ 33-43. Moreover, the so-called Vardi Ring which allegedly served as Andin's "inspiration" is a knockoff of a ring Yurman has had in its line for years, and also uses the same unique combination of design elements used in the Yurman Copyrighted Enhancer and the Yurman Trade Dress Items. Yurman Decl. at ¶ 29.

**Statement No. 19**

The Yurman Enhancer consists of a variety of elements, including: (1) a diamond pave rectangular center (which Yurman refers to as a cushion) in a north-south alignment; (2) a stepped, double gold frame surrounding the pave field; (3) a thick single sculpted cable design below and surrounding the gold frame, sculpted in a clockwise direction; (4) a polished silver outer frame; (5) a gold crown at the top of the pendant; (6) a gold crown at the bottom of the bale; and (7) silver piping surrounding a silver sculpted cable bale. Authority: Azrielant Dec. at ¶ 20 and Exs. A and K; Azulay Dec. at ¶ 15.

**Yurman's Response To Statement No. 19**:

Yurman disputes the factual assertions in Statement No. 19 to the extent that they are intended to imply that Yurman seeks to protect each individual design element used in the Yurman Copyrighted Enhancer. The copyright registration for the Yurman Copyrighted Enhancer depicts the unique combination of design elements found in this design. Further, Yurman disputes the description in Statement No. 19: the unique combination of design

elements which makes the Yurman Copyrighted Enhancer original are a focal point of pave diamonds in a cushion shape, surrounded or framed by a band of gold, which in turn is surrounded or framed by twisted wire or cable, in sterling silver. Ederer Decl. Ex. 3 at ¶ 69; Yurman Decl. ¶ 20.

**Statement No. 20**

The use of a pave central field is well known. <u>Authority</u>: Azrielant Dec. at ¶ 21 and Ex. L; Azulay Dec. at ¶ 17.

**Yurman's Response To Statement No. 20**:

Yurman disputes the facts asserted in Statement No. 20 to the extent that they are intended to imply that Yurman seeks to protect the use of a pave central field alone. It is Yurman's unique combination, in the Yurman Copyrighted Enhancer, of a cushion shaped focal point consisting of pave diamonds, surrounded by a smooth band of yellow gold, surrounded by an outside trim of cable, or twisted wire, in sterling silver that was new, fresh, and distinct from anything previously available in the jewelry market when Yurman first created it in 1997. Yurman Decl. ¶ 20. None of the jewelry items depicted in the exhibits of prior jewelry art attached to Mr. Azrielant's declaration contains the combination of elements that appear in the Yurman Copyrighted Enhancer. Yurman Decl. ¶ 25. Further, no authority cited by Andin supports the assertion that a pave central field is "well known." Azrielant Decl. Ex. L.

**Statement No. 21**

There are numerous uses of rounded stones – or as Yurman refers to it, "cushions" – as the central focal point of a piece of jewelry. <u>Authority</u>: Azrielant Dec. at ¶ 22 and Ex. M; Azulay Dec. at ¶ 18.

**Yurman's Response To Statement No. 21**:

Yurman disputes the facts asserted in Statement No. 21 to the extent that it is intended to imply that Yurman seeks to protect the use of "cushions" as the central focal point of a piece of jewelry alone. Yurman does not claim that it created cushions as the central focal point in a piece of jewelry. It is Yurman's unique combination, in the Yurman Copyrighted Enhancer, of a cushion shaped focal point consisting of pave diamonds, surrounded by a smooth band of yellow gold, surrounded by an outside trim of cable, or twisted wire, in sterling silver that was new, fresh, and distinct from anything previously available in the jewelry market when Yurman first created it in 1997. Yurman Decl. ¶ 20. None of the jewelry items depicted in the exhibits of prior jewelry art attached to Mr. Azrielant's declaration contains the combination of elements that appear in the Yurman Copyrighted Enhancer and in the Yurman Trade Dress. Yurman Decl. ¶ 25. Further, no authority cited by Andin supports the assertion that there are "numerous uses" of rounded stone as the central focal point of a piece of jewelry.

**Statement No. 22**

Gold "framing" of a central stone – including pave diamond cushions – is something which has existed long before Yurman. Authority: Azrielant Dec. at ¶ 23 and Ex. N; Azulay Dec. at ¶ 19.

**Yurman's Response To Statement No. 22**:

Yurman disputes the facts asserted in Statement No. 22 to the extent that it is intended to imply that Yurman seeks to protect the use of gold framing of a central stone alone. Yurman does not claim that it created gold framing. It is Yurman's unique combination, in the Yurman Copyrighted Enhancer, of a cushion shaped focal point consisting of pave diamonds, surrounded by a smooth band of yellow gold, surrounded by an outside trim of cable, or twisted wire, in sterling silver that was new, fresh, and distinct from anything previously available in the jewelry

market when Yurman first created it in 1997. Yurman Decl. ¶ 20. None of the jewelry items

depicted in the exhibits of prior jewelry art attached to Mr. Azrielant's declaration contains the

combination of elements that appear in the Yurman Copyrighted Enhancer and the Yurman

Trade Dress. Yurman Decl. ¶ 25. Further, no authority cited by Andin supports the assertion

that gold "framing" of a central stone existed long before Yurman.

**Statement No. 23**

    Cable jewelry has been used for centuries. <u>Authority</u>: Azrielant Dec. at ¶ 24 and Ex. 0;
Azulay Dec. at ¶ 20.

**Yurman's Response To Statement No. 23:**

    Yurman disputes the facts asserted in Statement No. 23 to the extent that it is intended to

imply that Yurman seeks to protect the use of cable in jewelry. Yurman does not claim that it

created cable. It is Yurman's unique combination, in the Yurman Copyrighed Enhancer, of a

cushion shaped focal point consisting of pave diamonds, surrounded by a smooth band of yellow

gold, surrounded by an outside trim of cable, or twisted wire, in sterling silver that was new,

fresh, and distinct from anything previously available in the jewelry market when Yurman first

created it in 1997. Yurman Decl. ¶ 20. None of the jewelry items depicted in the exhibits of

prior jewelry art attached to Mr. Azrielant's declaration contains the combination of elements

that appear in the Yurman Copyrighted Enhancer and the Yurman Trade Dress. Yurman Decl.

¶ 25. Further, no authority cited by Andin supports the assertion that cable jewelry has been

used for centuries.

**Statement No. 24**

    There are several products on the market today that have some or all of these features.
<u>Authority</u>: Azrielant Dec. at ¶ 25 and Ex. P (in particular pages Andin 00620, 623, 625, 629,
631, 634, 636, 639, 642, 645, 649, 652, 655, 658, 661, 664, 670, 676, 685, 686, 687, 689, 690,
694, 695, 698, 705, 708, 710, 713, 716, 722, 726, and 734), and Ex. X; Azulay Dec. at ¶ 21.

**Yurman's Response To Statement No. 24**:

Yurman disputes that all of the items depicted on the pages identified by Andin have all of the features, in combination, that make the Yurman Copyrighted Enhancer and the Trade Dress Items unique.[1]  At his deposition, Mr. Yurman identified Andin pages 620, 629, 658, 670, and 690 as showing pictures jewelry items that mimic the Yurman Trade Dress, but noted that pages 620, 629 and 690 all showed pictures of the same item.  Ederer Decl. Ex. 11 pp. 127-153. In addition, the ring Mr. Yurman identified on page 670 is the so-called Vardi Ring.  Yurman Decl. ¶ 29.  Moreover, each item identified by Mr. Yurman was created after Yurman designed the original items that incorporate the Yurman Trade Dress.  Yurman Decl. ¶ 30.  The remaining items contain one or more of the design elements used in the Yurman trade dress, but do not mimic the unique combination of those elements that constitutes the Yurman trade dress.  Ederer Decl. Ex. 11 pp. 127-153.

**Statement No. 25**

On January 23, 2008 David Yurman called Ofer Azrielant and complained that the Andin Pendant and the Andin Earrings infringed Yurman's rights in the Yurman Enhancer. <u>Authority</u>: Azrielant Dec. at ¶ 27.

**Yurman's Response To Statement No. 25**:

Disputed to the extent that Andin seeks to imply that Mr. Yurman informed Mr. Azrielant that only the pendant and the earring in the Andin Ensemble infringed Yurman's rights in the Yurman Copyrighted Enhancer.  In fact, Mr. Yurman informed Mr. Azrielant that the pendant, the earring, and the ring in the Andin Ensemble infringed Yurman's rights in the Yurman Copyrighted Enhancer.  Yurman Decl. at ¶ 32.

---

[1] The Exhibit P provided by Andin does not include the pages referenced in Statement No. 24. Yurman is responding based on the assumption that the document numbers correspond to the numbers on documents provided by Andin during discovery.

**Statement No. 26**

When the conversation turned to the Andin Ring, Mr. Yurman indicated that he did not have an issue with the Andin Ring and stated that the Andin Ring had been included in the cease and desist letters because of an error by Defendant Yurman's in-house counsel. <u>Authority</u>: Azrielant Dec. at ¶ 27.

**Yurman's Response To Statement No. 26**:

Disputed.  Yurman Decl.  ¶ 32.

**Statement No. 27**

The Andin Ring does not appear substantially similar to the protectable elements of the Yurman Enhancer or the Yurman Enhancer as a whole.  <u>Authority</u>: Azulay Dec. at ¶¶ 22, 23; Azrielant Dec. at Ex. R.

**Yurman's Response To Statement No. 27**:

Disputed.  Yurman Decl. ¶¶ 33-38.

**Statement No. 28**

The Andin Earring does not appear substantially similar to the protectable elements of the Yurman Enhancer or the Yurman Enhancer as a whole.  <u>Authority</u>: Azulay Dec. at ¶¶ 24-25; Azrielant Dec. at Ex. S.

**Yurman's Response To Statement No. 28**:

Disputed.  Yurman Decl. ¶¶ 33-38.

**Statement No. 29**

The Andin Pendant does not appear substantially similar to the protectable elements of the Yurman Enhancer or the Yurman Enhancer as a whole.  <u>Authority</u>: Azulay Dec. at ¶¶ 26-28; Azrielant Dec. at Ex. T.

**Yurman's Response To Statement No. 29**:

Disputed.  Yurman Decl. ¶¶ 33-38.

**Statement No. 30**

Yurman has produced no advertisements that feature its trade dress.

**Yurman's Response To Statement No. 30:**

Disputed. Yurman produced copies of catalogs and/or circulars from retailers including Neiman Marcus, Saks Fifth Avenue, Bloomingdales, and La Viano, as well as its own catalogs which advertise jewelry items containing the Yurman' Trade Dress. Hayward Decl. ¶¶ 15-16 and Exs. 1, 2. In addition, the Yurman Trade Dress Items were featured in numerous advertising circulars sent to customers, in print advertisements, and in in-store events. Hayward Decl. ¶¶ 15-16; Pennelli Decl. ¶¶ 8-10.

**Statement No. 31**

The only promotional materials produced by Yurman are catalogues. <u>Authority</u>: Azrielant Dec. Ex. U.

**Yurman's Response To Statement No. 31:**

Yurman does not dispute that the only promotional materials located and provided by Yurman during discovery were catalogs and/or circulars. However, the Yurman Trade Dress was featured in numerous advertising circulars sent to customers, in print advertisements, and in in-store events. Hayward Decl. ¶¶ 13-15; Pennelli Decl. ¶¶ 8-10.

**Statement No. 32**

The only promotion produced by Yurman shows the items at issue as products, and does not highlight or otherwise promote its alleged trade dress. <u>Authority</u>: Azrielant Dec. Ex. U.

**Yurman's Response To Statement No. 32:**

Disputed. The promotional material produced by Yurman contains photographs of highly distinctive jewelry items that clearly depict the Yurman Trade Dress. Azrielant Dec. Ex. U.

**Statement No. 33**

Yurman's current catalogues do not include the alleged trade dress. <u>Authority</u>: Azrielant Dec. Ex. V.

**Yurman's Response To Statement No. 33**:

Not disputed. Yurman's current catalogs do not include the Yurman Trade Dress Items because, like any company in the fashion industry, Yurman focuses its promotional efforts primarily on its newest and most current designs. However, during the period immediately following the launch of each of the Yurman Trade Dress Items, they were heavily advertised, promoted, and sold, and each such item continues to be sold today. Hayward Decl. ¶ 17; Pennelli Decl. ¶¶ 5-11.

**Statement No. 34**

Yurman's in-store displays do not feature this trade dress. <u>Authority</u>: Azulay Dec. at ¶ 13.

**Yurman's Response To Statement No. 34**:

Disputed. Andin's reference to "in-store displays" is vague and ambiguous. Yurman does not dispute that in-store displays in certain stores where Yurman products are sold do not currently feature the Yurman Trade Dress because, like any company in the fashion industry, Yurman focuses its promotion efforts primarily on its newest and most current designs. However, during the period immediately following the launch of the Yurman Trade Dress Items, they were heavily advertised, promoted, and sold, and they continue to be displayed and sold today. Hayward Decl. ¶ 17; Pennelli Decl. ¶¶ 5-11.

**Statement No. 35**

Yurman's employees at its flagship store could not find a copy of the Yurman Enhancer for over thirty minutes – despite being provided with a verbal description – and provided approximately 20 other items based on the description in the complaint. <u>Authority</u>: Azulay Dec. at ¶ 13.

**Yurman's Response To Statement No. 35**:

Disputed.  Ms. Azulay provides no indication of what she asked for or how she described the product she was looking for.  The assertion in Statement No. 35 is further undermined by the fact that there is no description of the Yurman Trade Dress contained in Andin's original complaint, so Azulay could not have based her requests for any product on the description in the complaint.  Ederer Decl. Ex. 20.  Mr. Azrielant testified that Andin purchased the Yurman Copyrighted Enhancer at Yurman's store on Madison Avenue on January 29, 2008.  Ederer Decl. Ex. 1 at ¶ 11.

**Statement No. 36**

Throughout the pendency of this action, Yurman's web-site has not had any of the pieces covered by the alleged trade dress.  <u>Authority</u>: Azrielant Dec. at ¶ 14 and Ex. E.

**Yurman's Response To Statement No. 36**:

Not disputed.  Yurman's website does not currently show items incorporating the Yurman Trade Dress because, like any company in the fashion industry, Yurman focuses its promotional efforts primarily on its newest and most current designs.  However, during the period immediately following the launch of the Yurman Trade Dress Items, they were heavily advertised, promoted, and sold, and continue to be sold today.  Hayward Decl. ¶ 17; Pennelli Decl. ¶¶ 5-11.

**Statement No. 37**

Yurman's current catalogues do not show any items that have the trade dress at issue here.  <u>Authority</u>: Azrielant Dec. at Ex. V.

**Yurman's Response To Statement No. 37**:

Not disputed.  Yurman's current catalogs do not show the Yurman Trade Dress Items because, like any company in the fashion industry, Yurman focuses its promotional efforts

primarily on its newest and most current designs. However, during the period immediately following the launch of the Yurman Trade Dress Items, they were heavily advertised, promoted, and sold, and they continue to be sold today. Hayward Decl. ¶ 17; Pennelli Decl. ¶¶ 5-11.

**Statement No. 38**

Yurman has no consumer studies related to its trade dress. <u>Authority</u>: Azrielant Dec. Ex. Y at 85-87.

**Yurman's Response To Statement No. 38**:

Not disputed.

**Statement No. 39**

Yurman has produced no unsolicited media coverage concerning its alleged trade dress.

**Yurman's Response To Statement No. 39**:

Disputed. Yurman produced unsolicited media coverage of the Silver Ice Collection from newspapers and other print publications from the period 1997-2000. Three of the Yurman items which incorporate the unique combination of elements of the Yurman Trade Dress were part of the Silver Ice Collection at that time. Moreover, the Yurman Trade Dress Items received additional media coverage in the years following their launch. Hayward Decl. ¶¶ 10, 19.

**Statement No. 40**

Yurman claims to sell more than 40,000 items in several hundred stores. <u>Authority</u>: Azrielant Dec. Ex. Q at 64; Ex. Y at 89.

**Yurman's Response To Statement No. 40**:

Disputed. Yurman has more than 40,000 items in its current line. Not all of those items are sold in all stores. Ederer Decl. Ex. 12 pp. 64-66, Ex. 11 p. 89.

**Statement No. 41**

Yurman has not sold a significant amount of pieces of jewelry featuring its alleged trade dress in the last 10 years. <u>Authority</u>: Caire Aucoin Dec. Ex. A-1.

**Yurman's Response To Statement No. 41**:

Disputed.  Sales data for the Yurman Trade Dress Items reflects nearly $30 million worth of such items have been sold, at retail since 1997.  Pennelli Decl. ¶¶ 5-6, Exs. 2, 3.

**Statement No. 42**

Yurman has sold less than 1,000 total products featuring the alleged trade dress in the last two years. <u>Authority</u>: Caire Aucoin Dec. Ex. A-1.

**Yurman's Response To Statement No. 42**:

Disputed.  From 2006 through early 2008, Yurman has sold more than 1,000 items featuring the Yurman Trade Dress.  Pennelli Decl. Ex. 1.  The Yurman Trade Dress Items continue to sell steadily, without significant promotion, ten years after the Yurman Trade Dress was first introduced.  Hayward Decl. ¶ 20.

**Statement No. 43**

Witnesses have been unable to find items featuring Yurman's alleged trade dress in retail stores, including in Yurman's own retail stores. <u>Authority</u>: Azrielant Dec. at ¶ 15, Ex. F at ¶ 7; Azulay Dec. at ¶¶ 12, 13, 14.

**Yurman's Response To Statement No. 43**:

Disputed.  Ms. Azulay testified that she purchased both the Yurman Copyrighted Enhancer and a Yurman ring that incorporates the Yurman Trade Dress at retail in 2008.  Azulay Dec. ¶¶ 12, 14.  Mr. Azrielant testified that Andin made no effort to try to find and purchase either the Yurman ring or the Yurman earrings that are the subject of the trade dress claims.  Ederer Decl Ex. 6 p. 40.  The undated declaration by Andin's former counsel (Ex. F to the Azrielant declaration) does not identify what retailers were contacted, who at each retailer provided the alleged information, how each retailer was contacted, or how the Yurman Trade Dress Items were described, and is, in any event, inadmissible hearsay.  Azrielant Dec. Ex. F.

**Statement No. 44**

Yurman has produced no evidence that any third party has plagiarized the trade dress it claims in this case.

**Yurman's Response To Statement No. 44:**

Disputed.  Ederer Decl. Exs. 14, 15.

**Statement No. 45**

There has been a variety of third parties that have used together all of the elements of Yurman's alleged trade dress.  <u>Authority</u>: Azrielant Dec. at Exs. P and X.

**Yurman's Response To Statement No. 45:**

Yurman denies that any other entity sold jewelry incorporating the Yurman Trade Dress prior to 1997 when Yurman designed the original jewelry items that incorporate the Yurman Trade Dress.  Indeed, Mr. Azrielant testified that he was not aware of any substantially identical designs that predated the creation of the Yurman Trade Dress.  Ederer Decl. Ex. 6 p. 324. Yurman further disputes that not all of the items depicted in the exhibits cited by Andin in support of its assertions in Statement 45 have all of the features, in combination, that make the Yurman Trade Dress Items unique.  Yurman does not dispute that David Yurman identified a small number of such items as items that mimic the Yurman Trade Dress.  However, the items Mr. Yurman identified as infringing knockoffs did not surface until 2005, at the earliest, after eight years of Yurman's exclusive use of the Yurman Trade Dress.  Yurman Decl. ¶¶ 29-30; Ederer Decl. Ex. 11 pp. 127-53.

**Statement No. 46**

David Yurman himself believes that the description of the "cushion" element in the alleged trade dress articulated in Yurman's Amended Answer and Counterclaims is incorrect. <u>Authority</u>: Azrielant Dec. Ex. Y at 31-33.

**Yurman's Response To Statement No. 46**:

Disputed. David Yurman testified that the trade dress articulated in Yurman's Amended

Answer and Counterclaims is "pretty on target." Mr. Yurman's testimony that not all cushions

are "elongated" does not make the description incorrect. Ederer Decl. Ex. 11 pp. 31-33.

**Statement No. 47**

Yurman cannot provide a precise definition of its "Signature Cable" which is a claimed
element of its trade dress. <u>Authority</u>: Azrielant Dec. Exs. L, M, N, 0, P, Q at 150-54; 208-210;
Ex. V (including at pages 8, 13, 15 and 26) and Ex. Y at 103-106.

**Yurman's Response To Statement No. 47**:

Disputed. Yurman can, and has, provided a precise definition of the term "signature

cable" as used as part of the description of the Yurman Trade Dress. The reference to "Signature

Cable" is to the unique way in which Yurman uses cable to interact with the rest of the design. It

is the use of cable as a design element in combination with other elements, not the used of any

one particular type of cable. There is no single cable element used over and over again in

Yurman designs -- that would be impossible given the physical limitations presented by each

individual jewelry item. Yurman Decl. 28; Ederer Decl. Exs. 11 pp. 103-06 and 12 pp. 150-54.

**Statement No. 48**

Andin's jewelry sells to mid-market retailers and discounters, which in this case were JC
Penney and Sam's Club. <u>Authority</u>: Azrielant Dec. at ¶¶ 42,44.

**Yurman's Response To Statement No. 48**:

Disputed. Andin sells to Finlay Fine Jewelers, which manages the jewelry business in a

variety of department stores across the country, including high end stores such as

Bloomingdales, and Lord & Taylor. Andin sold the ring that is part of the Andin Ensemble to

Finlay Fine Jewelers. Ederer Decl. Ex. 6 pp. 10-11, Ex. 9 pp. 11-13, 51. Moreover, Sam's Club

and J.C. Penney sell jewelry items at prices that compete directly with Yurman pricing, and

Sam's club competes with retailers such as Tiffany & Co. for jewelry customers. Ederer Decl. Ex. 10 pp. 35-36 & Exs. 18, 19.

**Statement No. 49**

Yurman's jewelry is sold only where luxury brands are sold. <u>Authority</u>: Azrielant Dec. at ¶ 43; Ex. Q at 48-63 and Ex. Y at 89-9.

**Yurman's Response To Statement No. 49**:

Disputed. Yurman products are sold in specialty retail stores and department stores, in independent retailers throughout the country (from New York, to Iowa, to Dallas), in company owned stores, and in discount locations such as Neiman Marcus Last Call, Saks Off Fifth, and two David Yurman outlet stores in Florida and Nevada. Yurman products are also sold through Finlay Fine Jewelry, an operator of jewelry departments in department stores throughout the United States, including Bloomingdales and Macy's, which is not considered a luxury brand seller. Yurman also "has a substantial online business, which provides access to Yurman products to consumers nationally, even in areas where there are no retail outlets selling Yurman products." Pennelli Decl. ¶ 12.

**Statement No. 50**

The consumers that purchase Yurman's jewelry are not the same as the consumers that purchase Andin's jewelry. <u>Authority</u>: Azrielant Dec. at ¶¶ 39-45; Azulay Dec. at ¶¶ 30-32.

**Yurman's Response To Statement No. 50**:

Disputed. Yurman consumers come from all demographics -- old and young, upper and middle class, fashion conscious and conservative in style. Many of these people shop at retailers like Sam's Club, Target, and J.C. Penney. Pennelli Decl. ¶¶ 13, 15-16. Further, Sam's Club competes with retailers such as Tiffany & Co. for jewelry customers, and typical Sam's Club

customers range across a wide variety of social and economic backgrounds. Ederer Decl. Ex. 10

pp. 35-36. Yurman products are retail priced as low as $295. Pennelli Decl. ¶ 13.

**Statement No. 51**

Andin has distributed more than 10,000 of the accused items – many of them with the

consent of Yurman. <u>Authority</u>: Azrielant Dec. at ¶ 45.

**Yurman's Response To Statement No. 51**:

Disputed. In consideration of Andin posting a bond for the payment of costs and

damages as may be incurred by Yurman as the result of sales by Wal-Mart and J.C. Penney,

Yurman agreed not to

> seek relief under Federal Rule 65, or otherwise seek to enjoin or
> interfere with, in this action or any other action the following sales
> of the goods at issue in this action by the following parties
> (collectively the "Interim Sales"):
>
> a. Sales by Wal-Mart to retail customers of the following units of
> the goods at issue namely, 1,164 units of rings, 1,254 units of
> earrings, and 1,400 units of pendants that Andin has committed to
> sell to Wal-Mart; and
>
> b. Sales by JC Penney to retail customers of the following units of
> the goods at issue: 800 units of rings, 760 units of earrings, and
> 800 units of pendants, that, Andin has committed to sell to JC
> Penney in connection with a March 2008 promotion.

Ederer Decl. Ex. 16 at ¶ 1. Such stipulation, therefore, indicates that the number of accused

items distributed by Andin is less than 10,000. Further, Yurman does not consent to any such

sales. Indeed, the stipulation further provided that it was entered "without prejudice to any

position any party may take in this action, on the merits or otherwise, and shall not constitute an

admission of liability or an admission against interest by any party." *Id.* at ¶ 10.

**Statement No. 52**

There has been no evidence of confusion between the products distributed by Andin and

Yurman. <u>Authority</u>: Azrielant Dec. at ¶ 45.

**Yurman's Response To Statement No. 52**:

Disputed.  Mr. Azrielant testified that Finlay Fine Jewelers did not want to buy the Andin

Ensemble because it had a Yurman look and requested a modification of Andin's design.  Ederer

Decl. Ex. 6 pp. 24-25.  Beryl Raff, the Executive Vice President of Fine Jewelry for J.C. Penney,

indicated to Mr. Azrielant, that had she focused on the Andin items, J. C. Penney would not have

purchased them, because they looked too much like Yurman.  Ederer Decl. Ex. 6 pp. 34-37, Ex.

22.

**Statement No. 53**

Andin did not have any knowledge of Yurman's trade dress – nor did a variety of people
with significant experience and positions in the industry.  <u>Authority</u>: Azrielant Dec. at ¶ 12; Ex.
Z at 87-88; Ex AA at 79-80; Azulay Dec. at ¶ 10; Lyle Dec. at ¶ 10; Williams Dec. at ¶ 14.

**Yurman's Response To Statement No. 53**:

Disputed.  Andin's self-serving assertion that it did not have any knowledge of the

Yurman Trade Dress defies credibility.  Ample circumstantial evidence demonstrates that Andin

and others had access to and were well aware of the Yurman Trade Dress.  Ederer Decl. Ex. 7

p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 p. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward

Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

Yurman jewelry is well-known in the industry.  Mr. Azrielant testified Finlay Fine

Jewelers did not want to buy the Andin Ensemble because it had a Yurman look and requested a

modification of Andin's design.  Ederer Decl. Ex. 6 pp. 24-25.  Beryl Raff, the Executive Vice

President of Fine Jewelry for J.C. Penney, indicated to Mr. Azrielant that had she focused on the

Andin items, J.C. Penney would not have purchased them, because they looked too much like

Yurman.  Ederer Decl. Ex. 6 pp. 34-37, Ex. 22.

Yurman products in general are well known by consumers for having a very distinctive look, and the combination of features embodied in the Yurman Trade Dress is one of the looks for which David Yurman has become well known.  Newberg Decl. ¶¶ 5, 8.

**Statement No. 54**

Purchasers of jewelry exert significant care when making a purchase.  <u>Authority:</u> Azrielant Dec. at ¶¶ 46-51; Azulay Dec. at ¶¶ 29-37.

**Yurman's Response To Statement No. 54:**

Disputed.  Pennelli Decl. ¶ 18.  Moreover, even if the purchaser knows that what she is buying is not a Yurman item, others who see her wearing it may not.  Jewelry products are particularly susceptible to post-sale confusion because the brand name is not seen when the jewelry is being worn in public.  Pennelli Decl. ¶ 18.

### **Additional Material Facts As To Which There Is A Genuine Issue To Be Tried**

1.    Andin had a reasonable opportunity to view the Yurman Copyrighted Enhancer. Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

2.    Andin had a reasonable opportunity to view the Yurman Trade Dress.  Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

3.    Vardi Gem Lustre had a reasonable opportunity to view the Yurman Copyrighted Enhancer.  Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-60, Ex. 8 pp. 42-43, Ex. 9 pp. 30-31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

4.    Vardi Gem Lustre had a reasonable opportunity to view the Yurman Trade Dress. Ederer Decl. Ex. 7 p. 81, Ex. 6 pp. 61, 158-160, Ex. 8 pp. 5, 10, 41-43, Ex. 9 p. 31; Newberg Decl. ¶¶ 5, 8; Hayward Decl. ¶¶ 13-19; Yurman Decl. ¶ 23; Pennelli Decl. ¶¶ 8-11.

5.    The ring in the Andin Ensemble is substantially similar to the Yurman Copyrighted Enhancer.  Yurman Decl. ¶¶ 33-38.

6.    The pendant in the Andin Ensemble is substantially similar to the Yurman Copyrighted Enhancer.  Yurman Decl. ¶¶ 33-38.

7.    The earring in the Andin Ensemble is substantially similar to the Yurman Copyrighted Enhancer.  Yurman Decl. ¶¶ 33-38.

8.    Yurman's expenditures promoting items incorporating the Yurman Trade Dress are sufficient to support a finding of secondary meaning.  Pennelli Decl. ¶¶ 8-10, Exs. 4, 5.

9.    Yurman's unsolicited media coverage of the Yurman Trade Dress supports a finding of secondary meaning.  Hayward Decl. ¶ 19, Ex. 3.

10.    Yurman's sales of jewelry items incorporating the Yurman Trade Dress support a finding of secondary meaning.  Pennelli Decl. ¶¶ 5-6, Exs. 1, 2, 3.

11.    Yurman's evidence that its Trade Dress has been plagiarized supports a finding of secondary meaning.  Ederer Decl. Exs. 14, 15.

12.    Yurman's enforcement actions against plagiarists support a finding of secondary meaning.  Ederer Decl. Exs. 14, 15.

13.    The length and exclusivity of Yurman's use of the Yurman Trade Dress supports a finding of secondary meaning.  Yurman Decl. ¶ 30.

14.    Yurman's Trade Dress is strong.  Hayward Declaration ¶ 20; Newberg Decl. ¶¶ 8, 10.

15. The items in the Andin Ensemble use the same combination of design elements in the same general arrangement, proportion, and shape as the Yurman Trade Dress, and interact with each other in exactly the same way. Yurman Decl. ¶¶ 39-43.

16. The same consumers who purchase Yurman jewelry also purchase Andin jewelry. Pennelli Decl. ¶¶ 12, 16; Ederer Decl. Ex. 10, pp. 35-36.

17. Andin did nothing to ensure that by copying the so-called Vardi Ring, it was not infringing the rights of any other party. Ederer Decl. Ex. 6, pp. 74-77.

18. Andin is knowledgeable about copyright protection, indeed it owns over 1500 copyright registrations. Ederer Decl. Ex. 6, pp. 79-86; Ex. 13.

19. Andin had claims of infringement brought against it on numerous occasions. Ederer Decl. Ex. 6, pp. 93-96.

20. Andin continued to sell the Andin Ensemble even after it was told by Finlay that its products looked too similar to Yurman. Ederer Decl. ¶ 10; Ex. 6, pp. 22-25, 152-55.

21. Yurman consumers are wide-ranging in age, economic class, and sophistication. Pennelli Decl. ¶ 16.

22. The items in the Andin Ensemble are of a lesser quality than the Yurman Trade Dress Items. Ederer Decl. Ex. 11, pp. 161-64.

23. Many discount and mid-market stores are selling diffusion lines of jewelry and fashion items. Pennelli Decl. ¶ 17.

24. Many designers of jewelry and fashion items have introduced less extensive product lines to attract middle and lower income consumers. Pennelli Decl. ¶ 17.

25. Even if a purchaser of one of the Andin items knows that she is not buying a Yurman item, others who see her wearing it do not. Pennelli Decl. ¶ 18.

Dated: July 3, 2008

Respectfully submitted,

ARNOLD & PORTER LLP

By: _____
Louis S. Ederer
Marla Eisland Sprie
John Maltbie
399 Park Avenue
New York, NY 10022
(212) 715-1000
Louis.Ederer@aporter.com
Marla.Sprie@aporter.com
John.Maltbie@aporter.com

Attorneys for Defendant-
Counterclaimant Yurman Studio, Inc.